Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1          VIDEOTAPED DEPOSITION OF IAN DAVIDSON,

2     taken at 4435 South Eastern Avenue, Las Vegas, Nevada, on

3     Monday, February 4, 2013, at 2:05 p.m., before Donna J.

4     Abrahamsen, RPR, Certified Court Reporter, in and for the

5     State of Nevada.

6     APPEARANCES:

7     For Plaintiff:

8               G. DALLAS HORTON & ASSOCIATES
                BY:  CHRISTIAN Z. SMITH, ESQ.
9               4435 South Eastern Avenue
                Las Vegas, Nevada  89119
10              (702)380-3100

11    For Defendants:

12              PHILLIPS, SPALLAS & ANGSTADT LLC
                BY:  LARA L. MILLER, ESQ.
13              504 South Ninth Street
                Las Vegas, Nevada  89101
14              (702)938-1510

15    Also Present:

16              Patti Lucchesi, videographer

17                     * * * * *

18

19

20

21

22

23

24

25

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

```
 1                        I N D E X

 2   IAN DAVIDSON
                                            Page
 3   By Mr. Smith                            5

 4

 5

 6

 7                     E X H I B I T S

 8   Number              Description        Page

 9     1        Diagram                      39

10     2        Safety Weekley Team Meeting Notes
                (multiple weeks)             68
11

12

13

14

15

16

17

18        Information Requested:   (None.)

19

20

21

22

23

24

25
```

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

```
 1              LAS VEGAS, NEVADA; MONDAY, FEBRUARY 4, 2013

 2                        2:05 P.M.

 3

 4              THE VIDEOGRAPHER:  This is Tape No. 1 to the

 5    videotaped deposition of Ian Davidson in the matter of

 6    Kayleen Shakespear versus Wal-Mart Stores, Inc., LLC,

 7    et al., in the United States District Court, District of

 8    Nevada, Case No. 2:12-cv-01064.

 9              This deposition is being held at G. Dallas Horton

10    & Associates, 4435 South Eastern Avenue, Las Vegas, Nevada

11    89119 on February 4th, 2013, at 2:05 P.M.  My name is Patti

12    Lucchesi.  I'm the videographer.  The court reporter is

13    Donna Abrahamsen.

14              Counsel, please introduce yourselves and

15    affiliations, and the witness will be sworn.

16              MS. MILLER:  Lara Miller on behalf of Wal-Mart

17    Stores.

18              MR. SMITH:  Christian Smith on behalf of the

19    plaintiff.

20

21                        IAN DAVIDSON,

22             called as a witness, being first duly

23        sworn to tell the truth, the whole truth, and nothing

24              but the truth, testified as follows:

25    / / / /
```

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

```
 1                    EXAMINATION

 2   BY MR. SMITH:

 3        Q    Good afternoon.  My name is Christian Smith.  I'm

 4   one of the attorneys of record for Kayleen Shakespear.  Can

 5   you state and spell your name for the record.

 6        A    Ian Davidson.  I-a-n D-a-v-i-d-s-o-n.

 7        Q    Mr. Davidson, the court reporter has placed you

 8   under oath.  Do you understand that that carries with it the

 9   same penalties of perjury as if you were to testify at the

10   time of trial?

11        A    Yes.

12        Q    Okay.  The most important aspect of today's

13   deposition is to ensure that we have a clear and concise

14   understanding of your testimony.  In order to ensure that, I

15   have a couple of instructions that I'd like to give you.  If

16   you could wait a couple seconds for me to finish my question

17   before you provide your response.  Do you understand that?

18        A    Uh-huh.  Yes.

19        Q    All right.  Good.  We'll get to that in a second.

20   The reason why I say that is -- is obviously that gives you

21   an opportunity to understand my question, but it will also

22   give Miss Miller an opportunity to make any objections that

23   she deems necessary.  Okay?

24        A    (Witness nods head.)

25        Q    Also, when you do provide a response, I ask that
```

Ian Davidson     February 4, 2013
* * * Videotaped Deposition * * *

1    you provide a clear, audible response.  No head nods or hand

2    gestures.  We are videotaping your deposition today, but I

3    still need you to provide a verbal response, and that's for

4    the benefit of the court reporter.  Do you understand that?

5        A    Yes.

6        Q    Also, Mr. Davidson, if you do not understand one

7    of my questions today, the best thing that you can do is ask

8    me to repeat or rephrase the question.  Do you understand

9    that?

10       A    Yes.

11       Q    Also, if you do not know an answer to one of my

12   questions today, the best thing that you can do for me and

13   for everybody in this case is to say, "I don't know," "I

14   don't recall."  I don't want you to guess or speculate to

15   any of your testimony.  Do you understand that?

16       A    Yes.

17       Q    At the conclusion of your deposition, probably

18   within a couple weeks, you'll have an opportunity to read

19   and review your transcript for any type of errors.  Common

20   errors can be spelling or grammar.  Do you understand that?

21       A    Yes.

22       Q    Okay.  I need to caution you that if you change

23   the substance of your testimony, meaning if you change your

24   actual testimony today, then myself or any of the attorneys

25   in this case may be able to use that to comment on your

Ian Davidson      February 4, 2013
* * * Videotaped Deposition * * *

| | | |
|---|---|---|
| 1 | | credibility.  Do you understand that? |
| 2 | A | Yes. |
| 3 | Q | Mr. Davidson, are you currently taking any |
| 4 | | prescription medication that would affect your ability to |
| 5 | | give clear and concise testimony? |
| 6 | A | No. |
| 7 | Q | Okay.  Mr. Davidson, what is your date of birth? |
| 8 | A | September 12th, 1978. |
| 9 | Q | And where were you born, sir? |
| 10 | A | In San Clemente, California. |
| 11 | Q | And what is your current residential address? |
| 12 | A | 3647 Wild Springs Street, Las Vegas, Nevada 89129. |
| 13 | Q | And how long have you lived at that address, sir? |
| 14 | A | One year. |
| 15 | Q | And overall, how long have you lived in Las Vegas? |
| 16 | A | Thirteen years. |
| 17 | Q | Did you attend and graduate high school? |
| 18 | A | Yes. |
| 19 | Q | And when did you graduate? |
| 20 | A | 1996. |
| 21 | Q | And after high school, did you go on to college? |
| 22 | A | Yes. |
| 23 | Q | Where did you go, sir? |
| 24 | A | De Anza College. |
| 25 | Q | And where is De Anza College? |

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

Page 8

```
 1      A     Mountain View, California.
 2      Q     And did you graduate from there?
 3      A     No.
 4      Q     What course of study were you pursuing?
 5      A     Business.
 6      Q     Other than your time at De Anza College, do you
 7   have any other formal education or training outside of high
 8   school and De Anza College?
 9      A     I also attended College of Southern Nevada and
10   American Public University, which is offered by Wal-Mart
11   Stores.
12      Q     Okay.  And did you receive any type of degree from
13   CSN?
14      A     Not yet.
15      Q     So you're currently going to CSN?
16      A     I'm in between semesters.
17      Q     And what is your course of study at CSN?
18      A     Business major as well.
19      Q     And when do you expect to receive your degree?
20      A     I have approximately two years to go.
21      Q     And then you said something about something
22   affiliated with Wal-Mart, is that correct?
23      A     Yes.
24      Q     What is that, sir?
25      A     American Public University.  It's actually a
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1    nationally accredited university that just Wal-Mart partners

 2    with.  So it's open to any attendees.

 3         Q    And what was your course of study there, sir?

 4         A    Business as well.

 5         Q    Did you receive any type of degree or certificate

 6    from that institute?

 7         A    No.

 8         Q    Okay.  Within the past ten years, have you been

 9    convicted of any felony?

10         A    No.

11         Q    Okay.  Have you ever been convicted of a

12    misdemeanor involving theft or dishonesty?

13         A    No.

14         Q    Have you ever served in the military?

15         A    No.

16         Q    Have you ever been a party to a civil lawsuit as a

17    plaintiff or a defendant?

18         A    No.

19         Q    Okay.  Have you ever had your deposition taken

20    before?

21         A    First time.  No.

22         Q    So this is your first time?

23         A    Yes.

24         Q    Okay.  Did you meet with any Wal-Mart employees in

25    preparation for your deposition today, not your counsel?
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1        A     I don't understand the question.

2        Q     Okay.  Other than your counsel, did you meet with

3   anyone affiliated with Wal-Mart in preparation for your

4   deposition today?

5        A     No.

6        Q     Did you -- speak at any point, have you spoken

7   with anyone other than your attorney from Wal-Mart with

8   respect to your deposition today?

9        A     In regards to anything regarding the case

10  whatsoever?

11       Q     Well, I'm -- I'm just asking -- I'm glad that you

12  asked that because that'll be my next question.  I'm just

13  asking with respect to your deposition and you preparing for

14  your deposition today.

15       A     No.

16       Q     Okay.  This incident occurred on August 5th, 2011,

17  at Store 2837.

18             Since this incident, have you met or spoken with

19  anyone affiliated from Wal-Mart, not your attorney, with

20  respect to this lawsuit?

21       A     With respect to this lawsuit?  No.

22       Q     Okay.  Well, when you say "with respect" -- okay.

23             So have you met with anybody with respect to the

24  incident that occurred on August 5th, 2011, other than your

25  counsel?

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1        A    I'd have to say I don't understand the question

2    because I -- what's the word?  I meet, you know, whether

3    they're scheduled meetings or non-scheduled meetings, with

4    Wal-Mart personnel very often --

5        Q    Okay.

6        A    -- being in management for the company.  So

7    there's, you know, if that was August 5th, 2011, there's

8    been many occasions that I would have interacted with

9    members of Wal-Mart.

10        Q    And I -- and I appreciate that.

11             I'm asking:  Have you met with anyone affiliated

12    with Wal-Mart regarding this incident --

13        A    No.

14        Q    -- that occurred on August 5th, 2011?

15        A    No.

16        Q    Okay.  Did you review any documents in preparation

17    of your deposition today?

18        A    In the same fashion that you asked the previous

19    question, as far as --

20        Q    Yeah.  And when I -- yeah.

21             Did you review any documents in preparation for

22    your deposition today?  For example, you know, in the past

23    week, couple weeks, did you look at anything to get yourself

24    prepared for today's deposition?

25        A    With counsel or without counsel?

All-American Court Reporters   (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1        Q      Well, with -- it does the matter because that's --

2    if it's with counsel, it's not necessarily attorney-client

3    privilege because I -- I have a right to know what documents

4    you reviewed.  Now, I don't have a right to know what

5    conversations you and your counsel had regarding those

6    documents.  I just have a right to know what documents you

7    reviewed, if any.

8        A      I still don't understand the question.  I would

9    say that the only time that I have had any documents

10   reviewed about this case would be with counsel.

11       Q      And I understand that.

12              But I have a right to know what documents you

13   reviewed, sir.

14       A      You didn't ask that question.

15       Q      Yes, I did.

16       A      Okay.

17       Q      Okay.  And I'll -- and that's fine.  I'm not --

18       A      You actually asked me if I have met -- if I have

19   reviewed documents.  You didn't ask me what documents.

20       Q      Okay.  Sir, let's -- I mean, I'm not trying to

21   play games here.

22       A      I want to make sure I answer the questions

23   appropriately.

24       Q      And I -- I completely understand.  Okay.  So I'll

25   ask my question again.

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1           I asked you:  Did you review any documents in
2    preparation for this deposition.  That was my underlying
3    question.
4        A    Yes.
5        Q    Okay.  What documents did you review in
6    preparation for your deposition today?
7        A    There was multiple documents that -- which
8    documents are you referring to, because yes.
9        Q    Okay.  Well, sir, I'm not in your mind.  Okay?
10   And I don't know what you did.
11       A    Okay.
12       Q    So I have to ask you a very broad question.  And
13   then you're, you know, you tell me.  I asked you what
14   documents you reviewed.  You said, "Multiple documents."
15           So my next question is:  What are those documents
16   that you reviewed?
17       A    I reviewed different documents that are, you know,
18   Wal-Mart confidential documents that are within the company,
19   and some of those documents also, from my understanding,
20   were released to you.
21       Q    Okay.  So if I understand correctly, you reviewed
22   most likely documents that would be best described as
23   policies and procedures with respect to Wal-Mart.  Is that
24   fair to say?
25       A    I don't think we covered policies and procedures.

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1      Q      Okay.  Sir, let's -- let's just kind of make it

2   simple.

3             Can you describe for me the documents that you

4   reviewed?

5      A      I reviewed different types of documents as far as

6   safety team meeting notes -- actually, that's really the

7   only documents that I reviewed today was the safety team

8   meeting notes.  And I also reviewed different documents

9   pertaining to service within Wal-Mart.

10     Q      Okay.  The safety team meeting notes, are they the

11  safety team meeting notes that were derived from Store 2837?

12     A      Yes.

13     Q      Okay.  Now, you said that you reviewed some other

14  documents pertaining to service.

15     A      Uh-huh.

16     Q      If you could explain to me what those documents

17  are that you reviewed.

18     A      I reviewed different documents pertaining to

19  service within our systems within Wal-Mart.  So --

20  specifically to our camera systems.

21     Q      Okay.  So you reviewed documents in relation to

22  surveillance cameras?

23     A      Yes.

24     Q      Specifically for Store 2837?

25     A      Yes.

Ian Davidson     February 4, 2013
* * * Videotaped Deposition * * *

1       Q     Did you review documents as to the location of

2   surveillance cameras within Store 2837?

3       A     I don't understand the question.

4       Q     Okay.  Did you review any documents that told you

5   where cameras are positioned throughout Store 2837?

6       A     No.  I under -- I know where the doc -- where the

7   cameras are.

8       Q     Okay.

9       A     I mean --

10      Q     Okay.  And we'll get to that in a second.

11            Did you review any documents pertaining to how

12   long surveillance video is kept before it is either recorded

13   over or destroyed?

14      A     Well, at no point do we destroy -- did you say

15   "camera evidence" or "camera footage"?

16      Q     Sir, I'm -- I'm really not trying to be difficult

17   here today.  I'm not.  Okay?

18      A     I understand that, but, you know, I want to make

19   sure that --

20      Q     The problem that I'm having, sir, is that I'm

21   asking you questions, and I'm asking you specifically what

22   documents that you've reviewed with respect to surveillance

23   cameras, and you've provided me with a very vague response.

24   So if you can describe for me the documents that you

25   reviewed pertaining to surveillance cameras.

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1      A      The document that I reviewed was a spreadsheet

2   that showed service that had been scheduled and approved and

3   serviced within my store at the time, 2837.

4      Q      Okay.  So you reviewed some type of document that

5   showed some type of maintenance schedule or when maintenance

6   was going to be performed on surveillance cameras within

7   Store 2837?

8      A      Yes.  Not necessarily as scheduled because there

9   was no -- it was always constantly things happening with the

10  cameras.  So it was a spreadsheet that involved what types

11  of services were maintained, executed, connected, whatever

12  you want to call it.

13     Q      Okay.

14     A      Necessarily it was a log of when service had been

15  conducted, scheduled, and approved.

16     Q      And is that a document that was provided to you by

17  counsel, or is that something that you, given your position

18  within Wal-Mart, was able to locate?

19     A      I could have access to that document if I wanted

20  to.  Is that your question or --

21     Q      I'm just trying to -- who -- who provided with you

22  the document, sir?

23     A      I actually just reviewed it.  I didn't gain access

24  to the document.

25     Q      Okay.  Did you review it on some type of computer

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1    system?

 2         A    Yes.

 3         Q    Okay.  And was this Wal-Mart's computer system?

 4         A    No.

 5         Q    And whose computer system was it, sir?

 6         A    Counsel's.

 7         Q    Okay.  Now, did this spreadsheet provide you with

 8    any indication as to what type of -- or what surveillance

 9    cameras were or were not functioning on the day of this

10    incident which was August 5th, 2011?

11         A    Yes.

12         Q    And we're -- okay.

13              Counsel, have you provided this document to us?

14              MS. MILLER:  We just recently became aware of it

15    ourselves.  We just requested it from the service

16    provider --

17              MR. SMITH:  Okay.

18              MS. MILLER:  -- because we just got notice of your

19    site inspection just a couple weeks ago.  I've been trying

20    to track it down from the service provider myself.

21              MR. SMITH:  Okay.  Thank you.

22              MS. MILLER:  Uh-huh.

23    BY MR. SMITH:

24         Q    Okay.  Well, let's just cut to the chase here.

25              Mr. Davidson, are you aware of where this incident
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    occurred on August 5, 2011?

2         A    Yes.

3         Q    Okay.  To your knowledge, is there a surveillance

4    camera located near the area where this incident occurred?

5         A    I actually cannot discuss Wal-Mart confidential --

6              MR. SMITH:  Counsel?

7              MS. MILLER:  Ian --

8              THE WITNESS:  Yes.

9              MS. MILLER:  -- you need to provide him with

10   information to the best of your ability.

11             MR. SMITH:  So if you need to take a second to

12   meet with him, I -- I don't have a problem with that.

13             THE WITNESS:  Can we do that?

14             MS. MILLER:  Okay.

15             We're going to go off the record.

16             THE VIDEOGRAPHER:  Off the record at 2:20 P.M.

17             (Brief recess.)

18             THE VIDEOGRAPHER:  Time is now 2:30 P.M.  We're

19   back on the record.

20   BY MR. SMITH:

21        Q    Before we took a break, Mr. Davidson, I was asking

22   you questions about the surveillance video cameras inside

23   Store 2837.

24             To your knowledge, are there surveillance cameras

25   that would capture footage of the produce department and the

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    areas surrounding the produce department?

2         A    That would capture areas of the produce

3    department, yes.

4         Q    Okay.  To your knowledge, is there a camera

5    that -- you -- you said earlier before we took the break

6    that you knew where my client's incident occurred on

7    August 5, 2011, is that correct?

8         A    Yes.

9         Q    What is your understanding as to where the

10   incident occurred?

11        A    On freezer Aisle 1.

12        Q    Okay.  To your knowledge, is there a surveillance

13   camera that would have captured this incident on the day of

14   the incident, August 5, 2011?

15        A    No.

16        Q    Now, you said that you -- okay.

17             Is there a surveillance camera in -- near Aisle 1

18   of the produce -- sorry -- near -- near Aisle 1 of the

19   freezer department?

20             MS. MILLER:  Objection.  Vague.  Overbroad.

21   Ambiguous.

22             You need to clarify, Counsel, please.

23   BY MR. SMITH:

24        Q    Okay.  To your knowledge, is there a surveillance

25   camera near the freezer Aisle No. 1 that's also kind of in

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1    the produce/bakery department?

2              MS. MILLER:  It's still -- objection.  Still

3    vague, overbroad, and ambiguous.  Please narrow it down.

4              MR. SMITH:  Counsel, I can't narrow it down

5    anymore.

6         Q    Mr. Davidson, you can go ahead.  Let me ask you

7    this way:  Mr. Davidson, how many surveillance cameras are

8    in the produce department that would capture surveillance

9    video of the produce department in the areas surrounding the

10   produce department?

11        A    One.

12        Q    Okay.  Where is that camera located, sir?

13        A    Near the bakery.

14             MR. SMITH:  Okay.  Miss Miller, can I borrow a

15   sheet of your paper?  Just a blank sheet, please.  Sorry.  I

16   didn't bring one with me.

17             MS. MILLER:  (Counsel complies.)

18   BY MR. SMITH:

19        Q    Mr. Davidson, can you do me a favor?  I'd like you

20   to draw a diagram for me, okay, to the best your knowledge.

21             What I'd like you to draw for me -- and I'll kind

22   of indicate this -- can you draw me where the produce

23   department is, where the bakery department is, and where the

24   first Aisle 1 is for the freezer.

25             MS. MILLER:  It's okay.

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
1              THE WITNESS:  (Drawing.)  What was your question
2     again?
3     BY MR. SMITH:
4         Q    Yes, okay.  We'll kind of walk through this, sir.
5              My understanding is that Store 2837 has a
6     McDonald's, is that correct?
7         A    Yes.
8         Q    Okay.  Show me the front entrance to the grocery
9     part of Store 2837, and we'll work our way from there, sir.
10        A    From what angle?
11        Q    Well, as you're walking -- if you're walking from
12    the parking lot into the grocery side of Store 2837, where
13    is the Wal-Mart?  I'm sorry.  Where -- strike that.
14             Where is the McDonald's?
15        A    So you're not going to see the McDonald's.  I
16    mean -- but the McDonald's would be in this area
17    (indicating) --
18        Q    Okay.  Sir --
19        A    -- to the right of the entrance as you walk in.
20        Q    Okay.  I need your help, Mr. Davidson.
21        A    I'm trying to help you.  I just want you to be
22    specific so I can understand --
23        Q    Well, sir, I am being specific --
24        A    -- and give you the right answers.
25        Q    -- but you're being evasive.  Okay?
```

Ian Davidson      February 4, 2013
* * * Videotaped Deposition * * *

1           I've asked you politely.  Okay.  I don't want to

2      have to get the court involved in this, and I've asked you

3      nicely.  Can you draw me -- we'll work our way down.

4           If you're coming in from the parking lot into the

5      grocery side, draw me where the entrance is.

6      A     You handed me a piece of paper.  So do you want me

7      to draw the entire Wal-Mart, and this is the Wal-Mart or

8      where --

9      Q     We're -- we're just focusing on the grocery side,

10     sir.  I don't care about any other -- because my

11     understanding, if you walk in from the -- of if you walk in

12     from the parking lot, you have a McDonald's on your right?

13     A     Yes, but there's two entrances to the store.  So

14     do you want me to draw you both entrances and include --

15     Q     Sir, I said the grocery side.

16     A     Okay.

17     Q     At no point in time did I say the other entrance.

18     Okay?  I said the grocery side.

19          So with that understanding, can you please draw me

20     where the McDonald's is.  And we'll work our way from there.

21     I mean, listen, I -- I've been in the store.  I -- I mean, I

22     can draw it for you, but I can't testify.  So I need you to

23     do this for me sir.

24          MS. MILLER:  Counsel, would you like me to --

25     okay.  Ian, here's what we want you to do.  Okay?

All-American Court Reporters   (702) 240-4393
www.aacrlv.com

Ian Davidson      February 4, 2013
* * * Videotaped Deposition * * *

```
 1              THE WITNESS:  Okay.

 2              MS. MILLER:  Mr. Smith needs you to draw the

 3    grocery entrance.  Okay?  The vestibule straight down the

 4    action alley in between the grocery department and general

 5    merchandise focusing on produce and Aisle 1 in the freezer

 6    section.  Okay?  You don't have to worry about anything past

 7    Aisle 1 and into grocery.  Okay?

 8              THE WITNESS:  Okay.

 9              MS. MILLER:  All he really cares about is produce

10    and Aisle 1 and a little bit past that.  And if you can get

11    a little bit of the main action alley through meat and into

12    the dairy, that would be great.  He would like a diagram of

13    that?  Okay?  Thank you.

14              MR. SMITH:  Thank you, Miss Miller.

15              MS. MILLER:  You're welcome.

16              THE WITNESS:  (Drawing.)

17    BY MR. SMITH:

18         Q    Okay.  Now, can you draw me where Aisle 1 is,

19    the -- the frozen food?

20         A    (Drawing.)

21         Q    Okay.  Can you just -- just indicate Aisle 1.

22         A    (Drawing.)

23         Q    Okay.  So let me see.

24              And that's McDonald's, is that correct, sir?

25         A    Yeah.
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1        Q     Okay.  Now, by marking an "X," can you tell me
 2   what your understanding as to where the incident occurred?
 3        A     (Drawing.)
 4        Q     Okay.  So you're indicating that it occurred
 5   somewhere within Aisle 1 closest to the bakery area, is that
 6   correct?
 7        A     You know, that's to the best of my knowledge.
 8        Q     Okay.  And let me -- my understanding,
 9   Mr. Davidson, is that over here to the left of the bakery,
10   my left, is we have the beginning of the meat department.
11   Is that accurate?
12        A     Yes.
13        Q     Okay.  I believe also there's a section there for
14   frozen seafood.  Is that accurate?
15        A     Yes.
16        Q     Okay.  So if you could just, like, up in this top
17   left-hand corner, if you could just indicate the word
18   "meat."  That way we have a good understanding of -- where
19   we are.
20        A     That would be, like, you know (indicating).
21        Q     And -- and I -- Mr. Davidson, listen --
22        A     I'm not architect, sorry.
23        Q     I'm not asking you to be Picasso.
24        A     Uh-huh.
25        Q     And this isn't, you know, expected to be drawn to
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    scale.  Okay?

2            So you had testified earlier that there is one

3    surveillance camera that you're aware of that's in the

4    produce department and I believe you testified that that

5    surveillance camera would not have captured video of the

6    incident, is that correct?

7        A    Yes.

8        Q    Can you indicate with an "X" where that

9    surveillance camera is, sir, on your diagram?

10       A    (Drawing.)

11       Q    Okay.  Now, can you just draw out a line that says

12   "surveillance."  Or just, you know, just next to it draw an

13   "S" for surveillance, however you want to indicate that.

14       A    (Drawing.)

15       Q    Okay.  Can you describe for me what that camera

16   looks like?

17       A    It's a PTZ --

18       Q    Okay.

19       A    -- camera.

20       Q    Does it have like a rod that comes down from the

21   ceiling and a -- like a bubble camera box or something like

22   that?

23       A    Yes.

24       Q    Okay.  Are there fake surveillance cameras in this

25   area of Store 2837, meaning, you know, if you were to look

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    up in the ceiling, you'd see kind of like a black spot --

2    black box that would give the perception that there are

3    surveillance cameras?

4        A    Honestly, I wouldn't normally answer that

5    question.  It'd be considered confidential.  I'm not trying

6    to be difficult, but that would be considered along the

7    lines of confidentiality.

8        Q    Okay.  Sir, you have to understand here, we

9    potentially -- and I'm not saying that we do -- but we

10   potentially have an issue with respect to spoliation of

11   evidence.

12            Are you aware that your policies and procedures

13   with respect to investigating an incident requires Wal-Mart

14   to pull surveillance video of -- of an hour before an

15   incident up to the incident even if the surveillance video

16   does not show the incident occurring?  Are you aware of that

17   policy and procedure?

18       A    Yes.

19       Q    Okay.  Wal-Mart in this case has taken the

20   position that they've done numerous safety sweeps prior to

21   the subject incident.

22            Would you agree with me that surveillance video

23   would be the best evidence to corroborate whether or not

24   safety sweeps were done?

25       A    At no point in time was I ever doing surveillance

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1    or was my team doing surveillance of safety sweeps.
 2         Q    Okay.
 3         A    That's not relative to the purpose of the cameras.
 4         Q    Okay.  Well, let me ask you this, Mr. Davidson:
 5    Has -- have you been informed that Michelle Smith testified
 6    at her deposition -- like, do you know who Michelle Smith
 7    is?
 8         A    Yes.
 9         Q    Okay.  Is that a yes?
10         A    Yes.
11         Q    Is it your understanding that Michelle Smith was
12    an assistant manager at Store 2837?
13         A    Yes.
14         Q    Is it your understanding that Michelle Smith was
15    One of the investigating assistant managers for this
16    incident that occurred on August 5, 2011?
17         A    Yes.
18         Q    Are you aware that Miss Smith testified that she
19    filled out a request for surveillance video form and gave it
20    to you?
21         A    I am unaware of that actually.  No.
22         Q    Okay.  So you do not -- let me ask you this:  Do
23    you recall being provided with a request for video
24    surveillance form by Miss Smith?
25         A    Being that the date is -- you know, I'm in a new
```

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1   role now.  I could not tell you to specifics that on that
 2   particular day that that occurred.
 3        Q    Okay.
 4        A    I can tell you that that is the procedure.
 5        Q    Okay.  Well, let me ask you -- let me back up, and
 6   I'm going to kind of lay some foundation.
 7             Is there a form that an investigating manager
 8   would fill out and give to you or somebody at Store 2837
 9   requesting that surveillance video be pulled an hour before
10   an incident up to the incident?
11        A    No.
12        Q    There is not a form?
13        A    No.
14        Q    So if Miss Smith testified that she recalls
15   filling out a form, she would be incorrect?
16        A    I don't know.
17        Q    Okay.  But you're saying there is no form that an
18   assistant manager who investigated an incident would fill
19   out and give it to you requesting that you pull surveillance
20   video of an hour before an incident up to the incident?
21        A    There is no form.  I mean, if you want me to tell
22   you there is no form in every store, I wouldn't be able to
23   tell you that.
24        Q    Okay.  But with respect to Store 2837, you're
25   saying that there's no form?
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1       A    I did not require a form, and there is no Wal-Mart
 2   form.
 3       Q    Okay.  So then essentially what you're saying is
 4   Miss Smith is lying --
 5       A    No.
 6       Q    -- with respect to --
 7       A    That's not what I'm saying because it's not
 8   relative to the situation right now.
 9       Q    Well --
10       A    That's not what I'm saying so, no.
11       Q    Well, no, sir.  It is really relevant and the
12   reason why it's relevant, sir, is because Wal-Mart has taken
13   the information that they were doing continuous safety
14   sweeps before my client's incident.  Surveillance video
15   would be the best evidence to corroborate whether or not
16   these safety sweeps were done.  So it is relevant.
17            MS. MILLER:  Objection.  Argumentative.  Is there
18   a question in there somewhere?
19            MR. SMITH:  Well, my question is going to be --
20   and I'm just going to -- we'll move on quickly.
21       Q    To your knowledge, you don't recall Miss Smith
22   providing you with any type of form requesting surveillance
23   video of this incident, is that correct?
24            MS. MILLER:  Objection.  Asked and answered.  He's
25   already given you his answer.
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    BY MR. SMITH:

2        Q    I know.  We're just going to get this clear for

3    the record.

4              Is that correct, sir?  You can go ahead and

5    answer.

6        A    Is what correct?

7        Q    Is it correct that you do not recall Miss Smith

8    providing you with a form that she filled out requesting

9    that you provide surveillance video of the incident?

10       A    There is no form.

11       Q    Okay.  So then that would be "No," you do not

12   recall her providing with you that form, is that correct?

13       A    There was no form so I would not recall it, I

14   guess.

15       Q    Okay.  Mr. Davidson, how do you know this camera

16   that you've marked as an "X" was not -- would -- would not

17   have captured the incident that occurred on August 5, 2011?

18   What investigation did you do to determine that that

19   surveillance camera that you marked as an "X" would not have

20   captured the incident that occurred on August 5, 2011?

21       A    I'm very familiar with the camera system.

22       Q    Okay.  That doesn't help me, sir.  That's --

23   that's not answering to my question.

24              I want you to tell me specifically what

25   investigation you did to determine that this camera that you

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    marked as an "X" did not provide any surveillance coverage

2    or video of my client on August -- my client's incident on

3    August 5, 2011.

4         A    There is no investigation required --

5         Q    Okay.

6         A    -- for me to do, and I am familiar with the camera

7    system.

8         Q    So then if you didn't do any type of

9    investigation, then how can you sit here today and say that

10   that camera that you marked as an "X" would -- did not

11   provide any coverage or footage of my client's incident?

12        A    Because I am familiar with the camera system and I

13   know where its reaches are within the store.

14        Q    Okay.  So are you telling me, as you sit here

15   today, that that camera that's marked as an "X" would not

16   have provided coverage for the incident?

17        A    So is it the same question you asked me before

18   because --

19        Q    No.  No, it's a different question, sir.

20        A    You asked me earlier -- the first question you

21   asked me was whether or not that camera would have coverage

22   of that area, and that the answer's "No."

23        Q    Okay.  And I was asking you what investigation you

24   did to determine that.

25             And are you just basing that on your own knowledge

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1    of that camera?

2          A    I'm basing it on the knowledge of the positioning

3    of the camera, yes.

4          Q    Okay.

5          A    If you're asking if I went back and actually,

6    like, physically went in and reviewed something, I could not

7    tell you because I cannot remember August 5th, 2011, and

8    however many accidents have occurred in that time since that

9    accident, there's no way for me to differentiate the

10   difference --

11         Q    Okay.

12         A    -- between them.  So I am familiar with the camera

13   system.  If you're asking me if it can see here or there, I

14   can tell you yes or no within a certain extent.

15         Q    Okay.

16         A    That's the extent of my knowledge.

17         Q    Okay.  So do me a favor.  Where you have marked as

18   "X" for the surveillance, draw me arrows in which areas that

19   camera would provide coverage.

20         A    So --

21         Q    To your knowledge.

22         A    It's a PTZ camera so --

23         Q    Okay.  And what is it -- and what does it --

24         A    So it has 360-degree surveillance capabilities.

25         Q    Okay.

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson         February 4, 2013
* * * Videotaped Deposition * * *

1        A     But it doesn't mean that it reaches beyond seeing

2    through physical pieces of equipment, freezers, produce,

3    floors, people, signs.  It does not have x-ray vision.  So

4    I'm just saying -- I'm not trying to sound facetious, but it

5    only has the ability to see in a circular direction.

6        Q     Okay.  So you -- you acknowledge that it provides

7    360-degree coverage of -- where that camera's located.

8        A     It has the ability to turn 360 degrees.

9        Q     Is there somebody -- does it turn on its own?

10        A     It can.

11        Q     On August 5, 2011, to your knowledge, was this a

12    camera that was -- would rotate, you know, on its own, you

13    know, so many times, you know, per second or per minute, or

14    did somebody actually have to hand you know -- you know,

15    operate it on its own accord?

16        A     I do not recall.

17        Q     Okay.  So let me ask you:  Where this camera is

18    located, and, you know, this Aisle No. 1, which is the

19    freezer I'll?

20        A     (Witness nods head.)

21        Q     Is the camera above the freezer aisle?  I mean, is

22    it stationed, you, know on the ceiling, but it's above the

23    freezer aisle?

24        A     It's in the ceiling.

25        Q     Okay.  I understand that.

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1            But does it provide -- can it provide with you

2    coverage that overlooks this freezer aisle?

3         A    You would not be able to see 100 percent of the

4    freezer aisle.

5         Q    Okay.  Now, there has been information -- and I

6    understand that you marked "X" here where my client's

7    incident occurred -- there's been information supplied by my

8    client at her deposition that she was more at the beginning

9    of this freezer aisle, kind of quasi near the produce

10   department.

11           Do you -- so -- Miss Miller, can I borrow your

12   pen?

13           MS. MILLER:  Sure.  Certainly.

14   BY MR. SMITH:

15        Q    I'm going to mark an "X" right here (drawing) as

16   to where my client has testified where the incident

17   occurred.

18           Assuming that her testimony is correct, do you

19   have any knowledge whether or not this surveillance camera

20   that you marked with an "X" would have captured footage of

21   this area of the freezer aisle?

22        A    From where you placed an "X," it's still behind

23   where there would be a visual capability within that

24   section.  So it's still blocked by a freezer.

25        Q    Okay.  Excuse me.  Apologize.

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1          Now, this PTZ camera that you said, is it

2     connected to the ceiling by a rod, or is it -- or is the

3     camera itself affixed to the top of the ceiling?

4          MS. MILLER:  Objection.  Asked and answered.

5     BY MR. SMITH:

6     Q    You can go ahead, sir.

7          I mean, is there a rod that drops down from the

8     ceiling and then you have a camera bulb, or is the camera

9     itself affixed to the actual ceiling?

10    A    I don't recall that particular --

11    Q    Okay.  Thank you.

12         Let me ask you this:  Were you ever asked on

13    August 5th, 2011, to pull any surveillance video of an

14    hour --

15         Miss Miller, I haven't asked this question.  Okay?

16    And I appreciate you anticipating my question.

17         Were you ever asked -- I mean, were you -- strike

18    that.

19         Did you ever pull any surveillance video of an

20    hour before the incident up to the incident on August 5,

21    2011?

22    A    I do not recall.

23    Q    Okay.  In the ensuing days after this incident on

24    August 5, 2011, did you ever pull any surveillance video of

25    an hour before up to the incident?

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1        A     The reason I say I do not recall is because as I

2    previously explained, 2837 is a high traffic, low-income,

3    high-accident level store.  Many occurrences happen within

4    that store.

5        Q     Okay.

6        A     I do not remember.

7        Q     And -- and that's fine, sir.  I appreciate your--

8    I just have to ask you questions.

9        A     That's fine.  I just want you to understand I'm

10   being honest with you when I explain that so --

11       Q     And, sir, I'm not accusing you of being dishonest.

12   Okay?  I just need to ask these questions.  Okay?

13             So if I understand your testimony, you do not

14   recall, if in the ensuing days, you pulled any surveillance

15   video of an hour before the incident up to the incident, is

16   that correct?

17       A     Well, I personally would not be in charge of that

18   as well.  So I have a team of associates that work for me.

19   I do not even know if I was present in the building that

20   day.  And I am not personally responsible for what you asked

21   if I did that.

22       Q     Who is the person within Store 2837 that --

23       A     Any one of my asset protection associates, sir.

24       Q     Now, I understand you're an asset protection

25   coordinator, is that correct, or you were at Store 2837 --

All-American Court Reporters     (702) 240-4393
www.aacrlv.com

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1        A    At the time.

2        Q    -- on this date, August 5, 2011 is that correct?

3        A    Yes.

4        Q    Okay.  We've kind of gotten a lot further than I

5    wanted to.  And we're going to go back and ask some

6    questions.

7              But as asset protection coordinator, did you have

8    the ability on the date of my client's incident to pull

9    surveillance video?

10       A    I told you I'm not sure if I was present.

11       Q    I -- sir, I understand that you don't know if you

12   were present, but I'm asking you if you -- let's assume you

13   were or assume that you weren't.

14             Did you have the ability to pull surveillance

15   video as the asset protection coordinator when my client's

16   incident occurred?

17       A    You know, basically when we talked earlier about

18   how the cameras are constantly being maintained?  I couldn't

19   honestly tell you if that was a day where the cameras were

20   up, where the cameras were functioning, where the cameras

21   were within a service request, where the cameras were

22   possibly being within a remodel.  So I don't really -- I

23   mean, any number of one of those things could have happened,

24   and that's what I'm trying to explain.

25       Q    And -- and I understand that, sir, and I

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1   appreciate it.

2         I'm just asking just in generalities:  As asset

3   coordinator probably in August of 2011, were you able to

4   pull surveillance video of an incident that occurred inside

5   your store?

6       A    I don't know.

7       Q    Have you -- as an asset protection coordinator in

8   Store 2837, had you ever had the occasion to pull

9   surveillance video for any type of incident, whether it be

10  concerns over a customer, you know, stealing merchandise or

11  any other type of incident?

12      A    Yes.

13      Q    Okay.  So then you do have the ability as asset

14  protection coordinator to pull surveillance video inside

15  Store 2837?

16      A    As of that date, yes.

17          MR. SMITH:  Okay.  Thank you.  Again, I know that

18  we -- can you do me a favor?  Can you date and sign this

19  because we're going to mark this as an exhibit.

20          MS. MILLER:  That's fine.  That's fine.  Just

21  circle this and mark this as Mr. Smith's note and then the

22  rest of it is yours.  Okay.

23          THE WITNESS:  (Drawing.)

24          MR. SMITH:  You can just put a circle around mine.

25  That'll indicate that.

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1              THE WITNESS:  (Drawing.)  Is today the fourth?

2              MS. MILLER:  Uh-huh.

3              MR. SMITH:  Yes, sir.

4              (Exhibit 1 marked.)

5    BY MR. SMITH:

6         Q    Okay.  Retreating back to my initial line of

7    questions, you said that you reviewed the safety team

8    meeting notes and that you reviewed a spreadsheet that

9    addressed surveillance video inside Store 2837, is that

10   correct, in preparation for your deposition today?

11        A    Yes.

12        Q    Okay.  That spreadsheet that you reviewed, did it

13   provide you with any information that would indicate that

14   the surveillance camera that you marked as an "X" was not in

15   service on the day of my client's incident which was

16   August 5, 2011?

17        A    Honestly, I did not review the dates.  I was

18   merely reviewing the types of service and the different,

19   like, things that were happening with the cameras.

20        Q    Okay.  This -- did it -- this spreadsheet, did it

21   go from, like, 2010 through 2011?  Can you kind of tell

22   me --

23        A    It basically --

24        Q    -- what dates it covered?

25        A    -- went by service.  So I basically was reviewing

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

Page 40

```
 1    the types of service on the spreadsheet.
 2         Q    Okay.  So it was a -- it's a document or
 3    spreadsheet that kind of gave you service history for this
 4    particular camera?
 5         A    Service history, but I couldn't find a way that
 6    was showing me, you know, it was -- it may have been, like,
 7    in a chronological order of some sort, but I didn't see
 8    that.  I was merely actually looking -- it was long, and it
 9    didn't fit the entire screen.  So it had portions that I was
10    reviewing that maintained maintenance on a particular type
11    of request, and that's what I was reviewing, sir.
12         Q    And this was something that was contained on your
13    counsel's computer, is that correct?
14         A    Yes.
15         Q    Okay.  Other than those documents, did you review
16    anything else in preparation for your deposition today?
17         A    Other than the safety team meeting notes and the
18    spreadsheet?
19         Q    Yes.  I think you had also said you maybe reviewed
20    some policies and procedures or something like that?
21         A    I'm familiar with the policies and procedures.  I
22    didn't review any policies and procedures.
23         Q    Okay.  Did you review any of the witness
24    statements that were generated from this incident --
25         A    No.
```

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1      Q      -- in preparation for your depo today?

2             Have you ever reviewed any of the witness

3    statements that were generated from this incident that

4    occurred on August 5, 2011?

5      A      Honestly, you know, I was reviewing so much of the

6    safety team meeting notes and some of the things that

7    happened in that store that, you know, like I said, there's

8    a lot of accidents in that store as well.  And I couldn't

9    tell you if I've actually read the witness statement for

10   this particular incident.

11     Q      As we sit here today, before August 5, 2011, do

12   you know how many customers' slip and fall accidents there

13   were in the produce department in the areas immediately

14   surrounding the produce department?

15     A      I don't have an exact number for you, sir.

16     Q      Do you have any type of documentation that you're

17   aware of that would supply you with that information?

18            MS. MILLER:  Objection.  Calls for speculation.

19   BY MR. SMITH:

20     Q      Are you aware of any documentation that's kept

21   internally with Wal-Mart that would provide you with that

22   information, sir?

23     A      If I were to try to retrieve them today, no.

24     Q      And -- you say "if I were to try to retrieve them

25   today," I mean, is it something that you could have

Ian Davidson      February 4, 2013
* * * Videotaped Deposition * * *

1    retrieved in the past?

2         A    If you were to ask me on that date, yes.

3         Q    So is there -- are you telling me that there is no

4    way that or -- or are you telling me that Wal-Mart does not

5    keep a historical tracking of slip and fall incidents that

6    occur in a specific department?

7         A    For current status, yes.

8         Q    Okay.

9         A    As far as, like, a ongoing from what I understand,

10   there's been system changeovers, from what I understand,

11   that data encryption has been an issue with systems within

12   the headquarters.  And then from what I also understand

13   from, you know, my own -- research regarding -- and my own

14   understanding of safety within Wal-Mart is that, you know,

15   as many e-mails cross the server within our company that it

16   would be near impossible to grab information like that.

17        Q    Have you heard of the term "trend analysis"?

18        A    Yes.

19        Q    Okay.  Are you aware whether or not Store 2837

20   prior to August 5, 2011, did, like, a store-level trend

21   analysis that would indicate how many customer incidents

22   occurred, what types those customer incidents were, and

23   where in the store those incidents occurred?

24        A    If you were to ask me on August 5, 2011, for me to

25   gather that information for you, I could have.

All-American Court Reporters   (702) 240-4393
www.aacrlv.com

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1      Q      Okay.

2      A      And then, also, that's where the safety action

3    plan is based off of.

4      Q      So as you're sitting here today, you're not able

5    to go back and acquire that information.  Is that your

6    testimony?

7      A      That's my testimony, sir.

8      Q      And why is that, sir?

9      A      Based on the few things that I just mentioned.

10      Q      Okay.  Can you -- I apologize.

11            You said because there's been some changes

12    within --

13            MS. MILLER:  And, furthermore, I'm going to object

14    because Mr. Davidson is no longer the asset protection

15    coordinator for -- or excuse me -- asset protection manager

16    for Store 2837.  He has since then been promoted.  He's no

17    longer in that position.  Therefore, these questions are

18    dangerously outside the scope of the court order, and I'm

19    going to ask you to refrain from asking him these questions.

20            However, I am going to let him answer that

21    question for you, but I'm going to ask you to bear that in

22    mind and keep your questions narrowly within the scope of

23    Mr. Davidson's job while he was the asset protection

24    manager.

25            Go on ahead and answer.

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1              THE WITNESS:  So the question was?

 2    BY MR. SMITH:

 3         Q    You said that as --

 4         A    What were the reasons?

 5         Q    Yeah.

 6              You -- you said that as -- as asset protection

 7    coordinator on August 5, 2011, you could have accessed that

 8    historical information with respect to trend analysis?

 9         A    Easily, yes.

10         Q    Right.

11              You say now, currently, because I asked you if

12    this is something that you could do now, go back and

13    historically pull that information --

14         A    Uh-huh.

15         Q    -- and you said that you're not able to do so.  Is

16    that accurate?

17         A    That's correct.

18         Q    Okay.  And I note -- can you just reiterate to me

19    again the reasons why you currently are not able to do that?

20         A    Well, actually, that is a good point is that I'm

21    no longer in -- job coded in that position to have that

22    capability.  And then the other three reasons that I

23    explained were system changeovers, upgrades in systems that

24    actually acquired new systems with completely new functions,

25    features.  It's a completely different program from what I
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    understand.  I don't use that program so I don't know.

2         Q    Okay.

3         A    You know, if I were to say, like, "Hey, the first

4    thing that comes to my mind is," you know, we sent the

5    information through e-mail.  Well, there's apparently, you

6    know, so many millions of e-mails that cross our server

7    daily, and in order to acquire that information, would be a

8    high amount of labor to do.

9              And, yeah, it's just not actually physically

10   available on the system today, and it's, you know, there's

11   other encryption issues within the company that prevent it

12   from happening.

13        Q    Okay.  What is your current job title with

14   Wal-Mart?

15        A    Assistant store manager.

16        Q    And which store are you the assistant store

17   manager over?

18        A    Do you want the Store No. 2592, 1807 West Craig

19   Road.

20        Q    And how long have you been in that position, sir?

21        A    About a year.

22        Q    And were you at Store 2837 prior to that?

23        A    Yes.

24        Q    Okay.  And how long did you work at Store 2837?

25        A    About three years.

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1      Q      And in your three years at Store 2837, did you

2   hold the title of asset protection coordinator?

3      A      Yes.  And also as protection manager.  It was the

4   same position with a different change in title.

5      Q      Did you work at a Wal-Mart store prior to going to

6   2837?

7      A      Yes.

8      Q      And which one did you work at prior to 2837?

9      A      I was actually at 1838.  Store 1838.

10      Q      And where's that located, sir?

11      A      3401 North Rainbow, I think.  I don't know.

12      Q      And what job title did you hold at that store?

13      A      I had multiple job titles, but the previous one, I

14   guess, would be photo lab manager.

15      Q      Overall --

16      A      You're asking me to dig here.  I don't know.  Dig

17   for information.  I don't remember some of this stuff.

18      Q      Okay.  Overall, how long have you been employed

19   with the Wal-Mart company?

20      A      Seven years.

21      Q      Explain to me what your job duties were as either

22   the asset protection coordinator or asset protection

23   protection manager within Store 1837.

24      A      I oversaw asset protection for the store.  And we

25   were not in charge of, but I was a advocate of safety

All-American Court Reporters   (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1   support staff management liaison to the store manager.

2        Q     And that would have been Scott Nash in August of

3   2011?

4        A     Yes.

5        Q     When you -- I think you said you were 1838 before

6   you went to 2837.

7              When you changed over to 2837, did you receive any

8   job training for your job duties as the asset protection

9   coordinator?

10       A     Yes.

11       Q     Describe for me the job training that you received

12   for that job position as asset protection coordinator.  I

13   just ask because obviously I've never gone through the

14   training.  So we're just kind of asking you to provide us a

15   thumbnail sketch of the training that you received for that

16   position.

17       A     Extensive training regarding management of an

18   asset protection team and the overseeing of asset protection

19   programs involving shrink, loss, inventory reduction,

20   inventory management.

21       Q     As part of asset protection coordinator, were you

22   responsible, or did you oversee the investigation of

23   customer incidents?  For example, slip/trip and fall

24   incidents that occurred inside of Store 2837?

25       A     Can you rephrase the question?  I don't

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1    understand.

2          Q     Yeah.

3                As a part of your job duties as asset protection

4    coordinator, was one of your job duties, you know, kind of

5    overseeing investigations of customer slip/trip and fall

6    incidents that occurred inside Store 2837?

7          A     It was not part of the scope of, you know, my

8    responsibilities.  If I was asked to do so, it was something

9    that I would, you know, do for only per management request

10   or manager request.  So it wasn't a regular everyday

11   function.

12         Q     Okay.  What would be the circumstances that would

13   involve you, you know, getting involved in the investigation

14   of a customer slip/trip and fall incident that occurred

15   inside Store 2837?

16         A     Maybe Miss -- well, see, I don't want to speculate

17   on -- I mean, what's -- what's the actual question?

18         Q     Well, you said, sir, that, you know, it wasn't a

19   part of your regular job duties that you would be asked, you

20   know, potentially by the store manager to kind of get

21   involved.  So I'm asking you what type of circumstances

22   would lend themselves for you to become involved into the

23   investigation of a slip/trip and fall incident inside

24   Store 2837 involving a customer.

25         A     There's still many reasons why I -- I would, you

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    know, potentially be involved in --

2        Q    Give me some of those reasons, sir.

3        A    You know, one of the reasons may be --

4        Q    She's just indicating to me that I've got five

5    minutes left on the videotape.

6            So go ahead, sir.

7        A    There potentially could be, you know, information

8    that doesn't corroborate with witness statements.

9        Q    Okay.  So if I understand your testimony, if there

10   was some concern that maybe the customer manufactured a

11   slip/trip and fall claim, then you would be potentially

12   brought in as a part of the investigation.  Is that fair to

13   say?

14       A    My assumption is never that a slip and fall is

15   manufactured.

16       Q    Sir -- and I understand that's not your assumption

17   but -- and I appreciate that.

18            But I -- I gathered from your testimony, you said

19   that if there is a situation where the witness statements

20   didn't seem to be credible, then you would be brought in.

21   So I'm asking you if there was suspicion that a customer

22   potentially manufactured a slip and fall claim, is that a

23   scenario that would lend itself to you becoming involved in

24   the investigation of the incident?

25       A    I -- I still would never assume that someone

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    manufactured a slip/trip and fall incident.  Essentially my

2    role would be to investigate all aspects of a incident

3    within the store.

4        Q    Okay.

5        A    And it could be any number of ideas about the

6    incident that I guess you could come to.  Essentially I'm

7    here to validate the facts in the incident.

8        Q    Okay.  Well, let's -- let me ask you this:  Do you

9    have any independent knowledge of my client's incident that

10   occurred on August 5, 2011?

11       A    What do you mean by "independent knowledge"?

12       Q    Meaning to your knowledge, were you involved in

13   any aspects of the investigation of my client's incident

14   that occurred on August 5th, 2011?

15       A    I honestly do not recall.

16       Q    Okay.  Have you been supplied with any factual

17   information as to what my client's allegations are with

18   respect to the incident that occurred on August 5, 2011?

19       A    And to that question, I also answered that I don't

20   recall.

21       Q    Okay.  So if I told that you my client claims that

22   she slipped and fell on a cherry pit in or near the produce

23   department and it caused her to fall, do you have any --

24   with that information being supplied to you, does that

25   refresh your recollection about my client's incident that

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

Page 51

```
 1    occurred on August 5, 2011?
 2         A    Regarding that's the reason why we're here today?
 3         Q    Yes.
 4         A    But I couldn't tell you any personal independent
 5    knowledge about the accident.
 6         Q    Okay.  So -- thank you.
 7              So prior to today's deposition, is it your
 8    testimony that had you no independent knowledge as to any
 9    aspects of my client's incident?
10         A    So I feel like I'm answering the same question.
11    I'm sorry.
12         Q    No, no, no, no.  No.  You -- you said --
13         A    No, I don't.
14         Q    No.  You had said that as far as today --
15         A    Uh-huh.
16         Q    -- and the context of your deposition, you had
17    been made aware of my client's incident.  I'm asking you up
18    until your deposition today, is this the first time you've
19    heard this factual information about what my client alleges
20    occurred to her on August 5, 2011?
21         A    This is not the first time, no.
22         Q    Okay.  Let me ask you this:  Since you don't
23    recall if you had any part of the investigation into my
24    client's incident, in any of the days, weeks, or months
25    after my client's incident, did anyone from Store 2837 or
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

Page 52

1    Wal-Mart Corporate come to you and say, "Mr. Davidson, we

2    suspect that Miss Shakespear may have manufactured her

3    claim, and we would like you to investigate this incident to

4    see if, in fact, that occurred"?

5       A    I investigated a lot of incidents within that

6    store.

7       Q    I'm not --

8       A    When I say "a lot," I mean a lot.  That's --

9    that's a very -- I think maybe you said you've been in the

10   store so --

11      Q    Well -- well, sir --

12      A    -- you understand the area.

13      Q    Sir, and I understand that.  Okay?

14           But, see, I'm asking a very specific question:

15   I'm asking you, Mr. Davidson:  And in the days, weeks,

16   months after this incident, did anybody come to you and say,

17   "Mr. Davidson, we had an incident that occurred on August 5,

18   2011.. A customer claims that she slipped and fell on a

19   cherry pit.  We don't believe her.  We think that she maybe

20   manufacturing this claim.  We would like you to do an

21   independent investigation into this incident to verify our

22   concerns."  So it's a yes or no question, sir.

23      A    No one came to me with speculation that a

24   manufactured incident occurred in the store.

25      Q    Okay.  Thank you.

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1              THE VIDEOGRAPHER:  I need to change the tape.

2              MR. SMITH:  We'll take a quick break.

3              THE VIDEOGRAPHER:  This marks the end of Tape No.

4    1 at 3:14 P.M.  We're off the record.

5              (Brief recess.)

6              THE VIDEOGRAPHER:  The time is now 3:27 P.M.

7    We're back on the record.  This marks the beginning of Tape

8    No. 2.

9    BY MR. SMITH:

10        Q    Mr. Davidson, did you do any investigation to

11   determine when the last safety sweep of the area where the

12   incident occurred and the surrounding areas?  Did you

13   personally do any type of investigation?

14        A    That wasn't a requirement of my position.

15        Q    Just kind of bear with me for the next couple of

16   questions.

17             Wal-Mart has identified Fred Garcia, Linda

18   Gallegos, and Mario Vargas as three maintenance associates.

19             Are you aware of those individuals being employed

20   at Store 2837?

21        A    At the time --

22        Q    Yes.

23        A    -- they were, yes.

24        Q    Okay.  They -- Wal-Mart has identified that these

25   three individuals did safety sweeps of the area anywhere

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1   between 5 minutes, 10 minutes, 20 minutes, 30 minutes,

2   45 minutes, and an hour before my client's incident.

3           My question to you is:  Did you at any point in

4   time ever meet with Mr. Garcia to determine or corroborate

5   if he, in fact, did these safety sweeps as Wal-Mart

6   contends?

7       A    Yeah.  That wasn't a requirement of my position.

8       Q    Okay.  So that would be "No," sir?

9       A    I do not recall.

10      Q    Okay.  Same question with respect to

11  Miss Gallegos:  Did you ever meet and corrob- -- or confirm

12  or corroborate with her whether or not she did these alleged

13  safety sweeps prior to my client's incident?

14      A    I do not recall, sir.

15      Q    Okay.  And lastly, with respect to Mr. Vargas, did

16  you at any point in time ever meet with him to confirm and

17  corroborate that he, in fact, did safety sweeps of the area

18  as alleged by Wal-Mart?

19      A    I do not recall.

20      Q    Okay.  In August of 2011, to your knowledge, did

21  Store 2837 have specific times where employees were required

22  to conduct safety sweeps of the produce department and the

23  areas surrounding the produce department?

24      A    That wasn't the scope of my working, but from my

25  understanding, it was ongoing process.  In fact, you know,

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1    my associates were constantly safety sweeping throughout the

2    store.

3         Q    When you say your "associates," what associates

4    did you -- did you supervise associates?

5         A    Excuse me.  The associates in the store --

6         Q    Okay.

7         A    -- 2837.

8         Q    Okay.  So you're saying that associates in

9    Store 2837 were doing on going continuous safety sweeps, is

10   that correct?

11        A    Yes.

12        Q    Okay.  We have obtained information that there

13   were things called "hourly safety sweeps."  Are you aware of

14   that?

15        A    I'm aware of the term, yes.

16        Q    Okay.  Are you aware how these, in August of 2011,

17   how these hourly safety sweeps were announced?

18             MS. MILLER:  Objection.  Calls for speculation.

19   BY MR. SMITH:

20        Q    You can go ahead and answer, sir.

21        A    You know, there would be any number of ways that a

22   safety sweep could be announced.

23        Q    Okay.  Let me ask you this:  In August of 2011, do

24   you know if these hourly safety sweeps were announced over

25   the PA system?

All-American Court Reporters   (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1        A    That was one method.

2        Q    Okay.  Do you know if, in fact, hourly safety

3    sweeps were announced over the PA system in August of 2011,

4    because we have obtained some information from other

5    individuals that we've deposed.  Some say yes; some say no.

6    And so I'm just trying to find out from you if you know if

7    these hourly safety sweeps were announced over the PA

8    system.

9        A    That was one method that they were announced.

10       Q    Okay.  Do you know -- I'm sorry.

11            When did you leave Store 2837?

12       A    Approximately a year ago.

13       Q    Okay.  So a year ago last February, so like

14    February 12th?

15       A    I don't have an exact date for you.  I've been in

16    my new store for, like, a year.

17       Q    I'm not -- I'm not asking for an exact date.  So

18    if we're going a year ago, we're saying February of 2012.

19            With that being said, when you left Store 2837,

20    were safety sweeps being announced hourly over the PA

21    system?

22            MS. MILLER:  Same objection.  Calls for

23    speculation.

24    BY MR. SMITH:

25       Q    You can go ahead, sir.

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

Page 57

```
 1        A     That was one method that safety sweeps were

 2   announced.

 3        Q     Okay.  When you left, though, was that -- was that

 4   method still being applied?

 5              MS. MILLER:  Objection.  Asked and answered.

 6   BY MR. SMITH:

 7        Q     Go ahead, sir.

 8        A     So that was one of the methods used to announce

 9   the safety sweeps.

10        Q     And I -- I understand that's one of the methods.

11   I'm just asking you if, when you left 2837 in February of

12   2012, if that method was still being employed.

13        A     Yes.

14        Q     Okay.  What were the other methods that Store 2837

15   would utilize to announce these hourly safety sweeps?

16        A     By radio.

17        Q     And who would be the individuals that would have

18   the radios?

19        A     There's any number of associates in the store that

20   would have the radio.

21        Q     Any other methods besides radio and the PA system?

22        A     Personally individually announcing them, like,

23   verbally.

24        Q     Back in August of 2011, do you know if Store 2837

25   had any type of protocol in place that would be utilized to
```

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    kind of do a checks and balances to ensure that associates

2    were actually doing safety sweeps?

3        A    Not that I'm aware of.

4        Q    To your knowledge, back in August of 2011, were

5    associates written up for not doing safety sweeps?

6            MS. MILLER:  Objection.  Calls for speculation.

7            THE WITNESS:  That wasn't the scope of my

8    responsibilities.

9    BY MR. SMITH:

10       Q    Okay.  Had you ever heard of employees being

11   written up for not doing safety sweeps as directed by

12   Store 2837?

13       A    Yeah.  I don't know if anyone got written up.  I

14   can say that store manager Scott definitely -- what's the

15   word?  He was very -- it was very important to him so I

16   could understand the level of intensity that Scott had about

17   that issue.

18       Q    Okay.  Have you ever heard of the term "safety

19   tool kit," or have you ever seen documents that are called

20   "safety tool kits"?

21           MS. MILLER:  Objection.  Back it up, up until

22   August 5th of 2011, please.

23   BY MR. SMITH:

24       Q    Prior to August 2011, have you ever reviewed any

25   documents called "safety tool kits"?

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1                MS. MILLER:  Thank you.

2                THE WITNESS:  Yes.

3    BY MR. QUESTIONER:

4        Q    Okay.  What's your understanding of what a safety

5    tool kit is?

6        A    It was merely a place where you could print off

7    the weekly safety team meeting notes.

8        Q    Okay.  Wal-Mart has provided us with safety tool

9    kits that basically span August of 2010 through August of

10   2011.  One, in particular, deals with week 38, and in this

11   safety tool kit, it states that company trends tell us that

12   most of our customers slip/trip and fall accidents occur on

13   Friday, Saturday, and Sunday between the hours of 11:00 A.M.

14   and 9:00 P.M. in the action alley produce/bakery, and front

15   end.  Were you aware of that company trend?

16               MS. MILLER:  It's okay.

17               THE WITNESS:  I mean, there's a number of company

18   trends, sir.

19   BY MR. SMITH:

20       Q    Okay.  I'm asking --

21       A    It might sound cavalier, but that's one of how

22   many trends that --

23       Q    Okay.

24       A    -- occur in the company.

25       Q    So you're aware of that -- that particular company

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1   trend that Wal-Mart was able to determine that that's when

2   most customers slip/trip and fall incidents occurred?

3       A    I mean, if you're just saying, like, is that when

4   there's the most customers in the store?

5       Q    Sir, this is your own documentation.  This is --

6   this is what Wal-Mart has produced.  Okay?

7           So let me ask you this:  This safety tool kit,

8   week 38, the document says what it says.  It indicates that

9   Wal-Mart Stores, because of this company trend, should

10  create a written strategic maintenance plan.

11          Have you ever heard of the term "written strategic

12  maintenance plan"?

13      A    There's no -- there's no document called the

14  "written strategic maintenance plan."

15      Q    Okay.  Are you aware of Store 2837 creating some

16  type of maintenance plan that would address company trends

17  that indicate that most customers slip/trip and fall

18  incidents occur on Friday, Saturday, Sunday between

19  11:00 A.M. and 9:00 P.M.?

20      A    I don't recall, sir.

21      Q    Does Store 28 -- when you were working at Store

22  2837 and going back to August of 2011, did Store 2837

23  require its associates to utilize sweep logs to keep track

24  of when floors were swept and/or cleaned?

25      A    No.

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1        Q     Okay.  Do you have any understanding as to why

2    Store 2837 did not require its associates to keep sweep

3    logs?

4        A     That's not a company directive.

5        Q     Are you aware that -- are you aware of whether

6    there are other Wal-Mart Stores in the Las Vegas area that

7    utilize sweep logs for its associates?

8              MS. MILLER:  Objection.  Calls for speculation.

9              THE WITNESS:  Yeah.  I only -- I would only be

10   able to tell you what happened at my store --

11   BY MR. QUESTIONER:

12       Q     Okay.

13       A     -- like, company direction knowing that --

14       Q     I believe you said -- so you've worked at a total

15   of four Wal-Mart stores in your seven years?

16       A     Three -- I mean, three mainly.  But did I name

17   four?

18       Q     I thought -- okay.  Let's see.

19             You're at your current one?

20       A     Okay.

21       Q     So then Store 2837?

22       A     Okay.

23       Q     And then there was the one on Rainbow?

24       A     Okay.

25       Q     Was there another -- I thought there was one where

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    you were, like, the manager of the photo lab.  Was that the

2    Rainbow location?

3         A    Uh-huh.

4         Q    Is that a yes?

5         A    Yes.

6         Q    Okay.  So other than those three stores, have you

7    worked at any other Wal-Mart stores?

8         A    Working in asset protection, I was a market

9    liaison for every single store in the valley.  So I -- at

10    any point in time would have interaction with store

11    management within other stores within Wal-Mart.  I have

12    literally been in every store in the -- in the valley.

13        Q    Okay.  To your knowledge, do any other stores

14    at -- within Wal-Mart in Las Vegas have their associates

15    utilize sweep logs?

16        A    My best understanding is that we do not have a

17    company directive that states that we are supposed to keep

18    and maintain or use, or however you're asking, sweep logs.

19        Q    I understand that it's not a company directive.

20    But I'm asking you:  To your knowledge, despite there being

21    no company directive, do other stores, to your knowledge,

22    Wal-Mart Stores in the Las Vegas Valley, have its associates

23    utilize sweep logs --

24        A    I don't know.

25        Q    -- even though it's not a company directive?

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1      A    I don't know.

2      Q    And if I understand you correctly, you don't have

3  any explanation or understanding as to why Store 2837 did

4  not utilize sweep logs other than it wasn't a company

5  directive, is that correct?

6           MS. MILLER:  Objection.  Misstates testimony.

7  BY MR. SMITH:

8      Q    Go ahead, sir.

9      A    That's -- that was not a requirement.

10     Q    Okay.  The safety tool kits that have been

11 produced in this case discuss the term "safety action plan."

12          Do you know what a safety action plan is?

13     A    Yes.

14     Q    What is a safety action plan?

15     A    It's pretty much literally what it states.  It's a

16 action plan for safety for the store.

17     Q    And is it for each individual store?  Like, for

18 example, would Store 2837 have its own safety action plan?

19 The store that you're currently at, would it have its own

20 safety action plan?

21     A    Yes.

22     Q    Okay.  When you worked at -- were these safety

23 action plans, were they generated quarterly?  Were they

24 generated every six months?  Were they generated once a

25 year?

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1        A    That, I don't -- I wouldn't be able to tell you.

2   I know that we -- we had a current safety action plan.

3        Q    Okay.  So in August of 2011, did Store 2837 have a

4   safety action plan?

5        A    Yes.

6        Q    And was this kind of like in a -- I mean, was it a

7   written booklet or -- strike that.

8             Was this a document that was kept in some type of

9   binder, or was this something that you accessed through the

10  computer system?

11       A    This -- it was actually posted.

12       Q    And was it posted on a -- like a -- help me out.

13  Where was it posted?  Sorry.

14       A    Safety -- in the safety center in my store.

15       Q    Okay.  So was it posted on some type of board?

16       A    Yeah.

17       Q    Okay.

18       A    On a board --

19       Q    Okay.

20       A    -- that was dedicated to safety.

21       Q    Okay.  You said that you were at Store 2837 for

22  approximately three years, is that correct?

23       A    Uh-huh.

24       Q    Do you know how many safety action plans Store

25  2837 would have had during that three-year period?

Ian Davidson      February 4, 2013
* * * Videotaped Deposition * * *

Page 65

1              MS. MILLER:  Objection.  Calls for speculation.

2    BY MR. SMITH:

3         Q    If you know, sir.

4         A    I mean, as many were required.

5         Q    Okay.  Let's say there's a safety action plan and

6    then there's another one that comes and replaces the old

7    safety action plan.

8              What would you do with the old safety action plans

9    that were posted on the board in the safety office?  Would

10   you maintain them, keep them in a file, or would you discard

11   them?

12        A    They were actually always kept in the safety

13   center.

14        Q    Okay.  So there would be an archive all the safety

15   action plans that would have, you know, been kept or in your

16   three years at the Store 2837?

17        A    Essentially, you know, they were -- they were

18   always posted in a neat sleeve on the safety board and -- so

19   that I could reference previous trends.  I never discarded

20   them.

21        Q    Okay.  Do you know if Wal-Mart had any internal

22   policy or procedure that enabled you to discard safety

23   action plans after so many years?

24        A    That's not a policy I ever referenced.

25        Q    Okay.  Do you know if these safety action plans

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    were uploaded into the wire system?

2        A    I don't believe so.  That's where we acquired the

3    form, the blank form.  Essentially it was typed into a pdf

4    blank form, but it was not allowed to be copied on the

5    system.  Like, it didn't even have the capability of doing

6    that on the system so --

7        Q    After -- were you the person that was in charge of

8    generating these safety action plans as the asset protection

9    coordinator for Store 2837?

10       A    I guess you could say that.  I -- when you say,

11   like, what, delegated it or --

12       Q    Yeah.

13            I mean, so you said that you would print off these

14   pdf forms and then would fill in the information?

15       A    Uh-huh.

16       Q    Are you the person that would be responsible for

17   filling in the information that is contained within these

18   safety action plans?

19       A    There's really nowhere where it says that's the

20   scope of my responsibility, but I took it upon myself to do

21   that.

22       Q    Okay.  Would -- after you supplied the information

23   and generated these safety action plans, were you required

24   to then send that document off to Corporate so that they

25   could ensure that you were, in fact, keeping safety action

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    plans for Store 2837?

2        A    We were not required to send it off to Corporate.

3    I would send it to our market asset protection manager,

4    though.

5.       Q    And that would be the MAPM?

6        A    Market Asset Protection Manager.

7        Q    And do you know who the MAPM was in August of

8    2011?

9        A    Yeah, I don't recall.  I think it was --

10       Q    You don't recall?

11       A    Don't recall.

12       Q    Okay.  Have you ever heard of the term "store

13   manager recap report"?

14       A    Yeah.  That's not like something that I reviewed

15   as an APM.

16       Q    But you are aware --

17       A    I've heard of it.

18       Q    And what's understanding of the store manager

19   recap report?

20            MS. MILLER:  Objection.  You need to limit it to

21   when Ian was an asset protection manager, not in his job

22   function now, please.

23   BY MR. SMITH:

24       Q    In August of 2011, when you were an asset

25   protection coordinator in August 2011, what was your

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    understanding of a store manager recap report?

2         A    Yeah, that -- that report, I wouldn't be able to

3    tell you what -- because it's not part of my job.

4         Q    Okay.  Do you know if this document was something

5    that was kept internally inside Store 2837 when you were an

6    asset protection coordinator?

7         A    I don't know.

8         Q    Now, you said that you reviewed store level safety

9    meeting notes for 2837 in preparation for your deposition

10   today, is that correct?

11        A    You said "safety team meeting notes"?

12        Q    Yes.

13        A    Yes.

14             MR. SMITH:  Okay.  I'm going to mark this as

15   Exhibit 2.

16             (Exhibit 2 marked.)

17             MS. MILLER:  Thanks.

18   BY MR. SMITH:

19        Q    Mr. Davidson, I've marked as Exhibit 2 the store

20   level safety meeting notes that Wal-Mart has produced in

21   this case.  Basically they provided them from August of 2010

22   up through January of 2011.

23             Are these the store level safety meeting notes

24   that you reviewed?

25        A    Yes.

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1        Q     Without going through all of these individually --

2   and the documents speak for themselves -- I'm going to ask

3   you this question:  There -- if you go through each week,

4   there's inconsistent reporting with respect to the number of

5   customer accidents year to date.  For example, one week

6   would say eight, but then if you go to the very next week,

7   it would say four and -- and talking about customer

8   accidents year to date.  So I'd like to know if you have any

9   explanation for these inconsistencies in the reporting of

10  customer accidents year to date.

11            MS. MILLER:  Objection.  Lacks foundation.

12  BY MR. SMITH:

13        Q     If you want, Mr. Davidson, I can provide you with

14  an example.

15        A     What was the question?

16        Q     Okay.  Let's kind of -- let's -- you see on week

17  No. 27 which is the first document that we have here?

18        A     Okay.

19        Q     Okay.  If you look at the bottom right-hand

20  corner, too, you'll see Bates Stamped numbers.  And instead

21  of reading that long number, I'll just refer to, like, the

22  last four digits.  Do you see that?

23        A     Okay.

24        Q     Okay.  So on week No. 27, which is August 6th,

25  2010, which is Bates Stamped numbered 1134, do you see where

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    it states "Customer accidents YTD" as eight?

2         A    Is that a Wal-Mart number, by the way, or is that

3    something that you identified it with or --

4         Q    No.  No. sir.  Here, I'm talking about the very

5    first page.  Okay.

6              Do you see at the bottom right-hand corner, we

7    have four digits which is 1134?

8         A    And I was very identifying those digits, yeah.

9         Q    I'm talking about very first.  Okay.

10             Do you see the very first page on this document?

11        A    Yes.

12        Q    Okay.  It says week No. 27 which is August 6,

13   2010.  Do you see that at the top?

14        A    Yes.

15        Q    Okay.  And do you see where it states "Customer

16   Accidents YTD" as being eight?

17        A    I'm trying to make sure that these -- yes.

18        Q    Okay.  Now, if you turn to the next page -- sir,

19   if you could turn to the next page which is week No. 28

20   which is August 13, 2010, and it's Bates Stamp numbered

21   1149.

22             Do you see where it states "Customer Accidents

23   YTD" six?

24        A    Okay.

25        Q    Okay.  Do you have any explanation for how the

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    week prior were indicating customer accidents year to date

2    as eight and now the very next week were only reporting six?

3        A    I wasn't in charge of this document, sir.

4        Q    Okay.

5        A    I wasn't in charge of generating this document

6    either.

7        Q    Okay.  So you have no explanation for the

8    inconsistencies, is that correct?

9        A    No.

10       Q    Okay.

11       A    I mean, essentially this isn't a -- and end-all

12   be-all tracking system for safety or accidents.  So it

13   wouldn't be something I would be reviewing.

14       Q    Well, sir, if -- if you turn to the very first

15   page, you see where it says "Name of Associates Attending?

16   And it appears where it says "APC Ian"?

17       A    Uh-huh.

18       Q    Do you see that?

19       A    Uh-huh.

20       Q    That indicates that you attended this meeting?

21       A    Uh-huh.

22       Q    Is that a yes?

23       A    Yes.

24       Q    Okay.  So as asset protection coordinator for

25   Store 2837, was part of your job duties attending these

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1    safety meetings?

2          A    It was not a requirement, sir, no.

3          Q    Okay.  Do you know if there was any Wal-Mart

4    policies and procedure that said that whoever generated

5    these meeting notes needed to make sure that the information

6    that was being reported was consistent and accurate?

7          A    Can you ask the question one more time, please?

8          Q    No problem.

9               Do you know if Wal-Mart had any internal policy

10   and procedure that mandated that whoever generated these

11   safety team notes, that the information that was supplied

12   needed to be consistent and accurate?

13         A    I would not be able to tell you if there was a

14   policy or procedure.  From my best understanding, no.

15         Q    Okay.  Do you know Shrieka Brown is?

16         A    Yes.

17         Q    Okay.  And do you know -- Ms. Brown was deposed

18   last week, and she testified that beginning in December of

19   2012, she became the safety team leader for Store 2837.

20   Were you aware of that?

21         A    In what date?  I'm sorry.

22         Q    The end of December of 2012.  So she testified

23   that she became the safety team leader for Store 2837.  Are

24   you aware of that?

25         A    She testified in December of 2012?

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1       Q    Sorry.   Strike that.   December of -- hold on.

2   December of 2010.   Thank you.   I apologize.   That in end of

3   December of 2010, she became the safety team leader for

4   Store 2837?   Are you aware of that?

5       A    You know, I don't know the exact date that she

6   became the safety team leader, but you know, that does sound

7   appropriate.

8       Q    I asked -- okay.   Thank you.   I didn't mean to

9   interrupt you.

10          I asked her -- and we went through every one of

11  these safety team meeting notes.   And I asked her if she had

12  any explanation for the inconsistencies in reporting

13  customer accidents year to date.   She didn't have any

14  explanation.

15          And then one of questions that I asked her was

16  "Did she ever -- or did she have any knowledge if anybody

17  got in trouble for having these inconsistencies," and she

18  indicated that you may be somebody that would know if there

19  was any type of repercussions for having inconsistent

20  information contained within these safety team meeting

21  notes.

22          MS. MILLER:   Objection.   Misstates Miss Brown's

23  testimony.

24  BY MR. SMITH:

25      Q    So my question to you, Mr. Davidson, is:   Do you

1  know if Wal-Mart had any type of policy and procedure that

2  penalized or, you know, provided any type of repercussion

3  for Store 2837 providing safety team meeting notes that

4  contained inconsistent information?

5          MS. MILLER:  Objection.  Asked and answered.

6          THE WITNESS:  I'm sorry.  It's, like, such a long

7  question.  I --

8  BY MR. SMITH:

9      Q    I apologize.  I had to provide with you some

10  foundation.

11          Without having to go through each one of these, I

12  mean, these -- these safety team meeting notes are filled

13  with inconsistencies regarding reports of customer year to

14  date accidents.

15          So my question to you is:  Do you know if Wal-Mart

16  Corporate had any type of punishment or anything of that

17  nature that was handed out to Store 2837 for having

18  inconsistent reporting with respect to customer accidents

19  year to date?

20          MS. MILLER:  Objection.  Argumentative.  And asked

21  and answered.  And we need to move off this line of

22  questioning because he's already provided you a sufficient

23  answer, Mr. Smith.

24          MR. SMITH:  Well, he hasn't.

25      Q    But you can go ahead, sir.

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1        A    Well, I mean, to the best of my understanding,

 2   this document is -- like I said, it's not the official

 3   reporting for customer -- any type of accidents.  It's

 4   literally not.  So I really would not --

 5        Q    Are you aware that Miss Brown testified that this

 6   information is uploaded to the wire system?

 7             MS. MILLER:  Objection.  Misstates Miss Brown's

 8   testimony.

 9             Go on ahead, Ian.

10   BY MR. SMITH:

11        Q    You can go ahead and --

12        A    I guess I wouldn't be aware because I wasn't

13   present.  So --

14        Q    Okay.  So if you're saying that this isn't the

15   official documentation with respect to how this store

16   reports its customer accidents, then what would be the

17   official document?

18        A    You know, you referred to the trend analysis

19   earlier.  That would be where I would review a customer

20   or -- excuse me -- a store's accident performance.

21        Q    Okay.

22        A    Would be in that.

23        Q    Okay.  And you would not review these weekly

24   safety team meeting notes?

25        A    Do you want an understanding of what the purpose
```

Ian Davidson      February 4, 2013
* * * Videotaped Deposition * * *

1    of safety team meeting notes are?

2        Q    Well, why don't you explain that to me?

3        A    The meeting in -- in itself -- essentially the

4    meeting is to generate support for safety and --

5        Q    Sir, if you could turn to document No. 1173.

6        A    (Examining.)

7        Q    This is written notes from the September 1st,

8    2010, safety team.

9             Do you see where it indicates "Cust YTD" as 197?

10       A    (Examining.)  Okay.  So I may not be reading it

11   the same way you are.

12       Q    Okay.  Sir, do you see where it says right here --

13   and I'm pointing to it -- "Cust YTD" 197 underneath accident

14   recap?

15       A    Yes.

16       Q    Okay.  Now, if you turn to the next week, which is

17   1176, meeting date September 8th, 2010, which is week No.

18   32, do you see where it states "Customer Accidents" YTD, and

19   it indicates 12?

20       A    Okay.

21       Q    Okay.  Let me ask you:  As the asset protection

22   coordinator for Store 2837, when these safety team meeting

23   notes were produced and generated, do you have any concerns

24   with the level of inconsistency in the reporting of customer

25   accidents as documented by these safety team meeting notes?

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1           MS. MILLER:  Objection.  Argumentative.

2           THE WITNESS:  Not within this document, sir.

3    BY MR. SMITH:

4       Q    Did you oversee the safety team for Store 2837

5    while you were the asset protection coordinator?

6       A    Just as other salary managers within the store

7    were considered sponsors, that would be what a role of the

8    asset protection coordinator would be -- would be a sponsor

9    so a support -- support manager for --

10      Q    Was there any requirement when you were asset

11   protection coordinator for you to attend all the safety team

12   meetings for Store 2837?

13      A    So I think you asked me that question, and my

14   answer was that there was not a requirement to attend each

15   and every --

16      Q    Okay.

17      A    -- safety team meeting.

18      Q    Was there a requirement that you had to attend so

19   many safety team meetings per month with Store 2837 when you

20   were the asset protection coordinator?

21      A    No, sir.

22      Q    Do you know if there was any requirement that the

23   store manager had to attend so many safety team meetings

24   within a given year?

25           MS. MILLER:  Objection.  Calls for speculation.

All-American Court Reporters   (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    BY MR. SMITH:

2        Q    If you know, Mr. Davidson.

3        A    No company direction other than best practice.  I

4    would say monthly was market directive.  I couldn't tell you

5    if that's regional or national directive, too.

6        Q    Okay.  Between the period of August -- well, let

7    me back up.

8             If you look at the last document which is 1246 --

9        A    Sorry.  (Examining.)

10       Q    -- okay, the date of this document is January 7,

11   2011, and it covers the safety weekly team meeting note for

12   week No. 49.  Wal-Mart has not provided us with any safety

13   team meeting notes between this date and up through August

14   of 2011.

15            To your knowledge, were safety team meetings still

16   going on during this approximately seven-month period?

17       A    Yes.

18       Q    Okay.  Do you have any explanation for why we

19   don't have any safety team meeting notes from January 7th,

20   2011, through August of 2011?

21            MS. MILLER:  Objection.  Calls for speculation.

22   BY MR. SMITH:

23       Q    Do you have any explanation, sir?

24       A    No, sir.

25       Q    Okay.  We deposed -- or I deposed Ms. Brown last

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    week, and at this time in January of 2011, she said that she

2    was the safety team leader.  She testified, I believe, if

3    I'm correct, that in December of 2011, she went on maternity

4    leave, and she returned back in March of 2012.

5            When I asked her that question about if she had

6    any explanation for why we didn't have any safety team

7    meeting notes between January of 2011 and March of 2012, she

8    said that you told her that the safety binder that contained

9    these documents went missing.

10           MS. MILLER:  Objection.  Misstates her testimony.

11   Grossly, inaccurately misstates her testimony.

12   BY MR. SMITH:

13       Q    Do you recall ever telling Miss Brown that the

14   binder that contained safety meeting notes between January

15   of 2011 and August of 2011 went missing?

16       A    No, sir.

17       Q    Are you aware of a binder that would have

18   contained all of these safety team meeting notes for

19   approximately a seven-month period?  Are you aware of a

20   binder going missing?

21       A    No, sir.

22       Q    Okay.  As the asset protection manager for

23   Store 2837, do you -- does it cause you any concern that for

24   almost a seven-month period we have no safety team meeting

25   notes pertaining to Store 2837?

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1            MS. MILLER:  Objection.  Asked and answered.  And

2     argumentative.

3     BY MR. SMITH:

4        Q    Go ahead and answer the question.

5            MS. MILLER:  You need to move off this line of

6     questioning, Counsel.

7     BY MR. SMITH:

8        Q    Go ahead and answer.

9        A    Honestly your question -- I don't understand your

10    question because, "Would it concern me?"

11       Q    Yeah.  Would it concern me?

12       A    That's not what you asked me though.

13       Q    Okay.  Would it concern you as the asset

14    coordinator --

15       A    If it were true, I mean, I couldn't tell you if

16    that's true, because I don't believe that to be true so --

17       Q    So you believe that somewhere there are safety

18    team meetings notes that haven't been produced for

19    Store 2837 covering the period of January 2011 through

20    August of 2011?

21           MS. MILLER:  Objection.  That misstates his

22    testimony.

23           THE WITNESS:  No longer in that capacity, sir, so

24    I wouldn't be able to --

25    / / / /

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    BY MR. SMITH:

2        Q    So as we sit here today, you have no explanation

3    for why we're missing seven months of safety team meeting

4    notes while you were the asset protection coordinator for

5    Store 2837, is that correct?

6        A    Did I state that there were safety team meeting

7    notes missing?

8            MS. MILLER:   I'm just -- I'm flummoxed that we're

9    still on this lining of questioning because I've objected,

10   I've asked him to move on, and he has refused.  So if he

11   just keeps on moving, we're going to be leaving shortly so

12   we're going to see what happens.

13   BY MR. SMITH:

14       Q    You -- you testified and I -- and I just want

15   to -- I want to understand your testimony.

16           You said that there were still safety team

17   meetings notes -- or there were safety team meetings between

18   January of 2011 and August of 2011, is that correct?

19       A    Yes.

20       Q    Okay.  Do you know if there were safety team

21   meeting notes generated for those safety team meetings?  Let

22   me -- let me back up before we get to that question.

23           Do you know if there's a requirement within

24   Wal-Mart to keep safety team meeting notes for each safety

25   team meeting that occurs -- that occurs inside Store 2837?

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1     A    Honestly, my boss would get really mad if she

2   didn't see these notes in her e-mail.

3     Q    And when you say your "boss," are you talking

4   about your boss currently?

5     A    No.

6     Q    Are you talking about your boss back then?

7     A    Yes.

8     Q    And who was -- who was your-- because you said,

9   "Her."  You said she would get mad.

10         Who was your boss back in August --

11    A    I'm looking at this document that says "SABLIVE,

12   S-A-B-L-I-V-E, @wal-mart.com."

13    Q    Sir, which -- which document are you -- the first

14   page?

15    A    The first page.

16    Q    Okay.  Can you tell me where you're referring --

17   oh where it says S-A-B-L-I-V-E@walmart.com?

18    A    Yes.

19    Q    And is that an individual?

20    A    That was my boss.

21    Q    And who is this individual?

22    A    Market asset protection manager.

23    Q    And who is that?  Who is SABLIVE?

24    A    Sandra.

25    Q    And what is Sandra's last name?

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1        A    Bliven.

 2        Q    I'm sorry.  What?

 3        A    Bliven.

 4        Q    Can you spell that for the court reporter.

 5        A    B-l-i-v-e-n.

 6        Q    Okay.  So Sandra Bliven was -- and you said she

 7   was the market asset protection manager and with -- during

 8   this time period?

 9        A    On the date that I referred to.

10        Q    Which would be August --

11        A    So page 1.

12        Q    Okay.

13        A    Yeah.

14        Q    So let's turn to the last document which is

15   January 7th, 2011.

16        A    (Examining.)

17        Q    Okay.  Are you there, sir?

18        A    Yeah.

19        Q    Okay.  Do you see -- okay.  So it says a copy

20   of -- apologize.  "It says a copy of these notes have been

21   mailed to SJNASH."

22             I'm assuming that refers to Scott Nash, is that

23   correct?

24        A    Yes.

25        Q    And then it says IKDAVID.s02837."  Do you know who
```

All-American Court Reporters   (702) 240-4393
www.aacrlv.com

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

1    IKDAVID is?

2       A    That's me.

3       Q    And then S-A-BLIVE is Sandra Bliven, is that

4    correct?

5       A    Yes.

6       Q    Okay.  So was it Corporate policy that all these

7    safety team meeting notes should be e-mailed to you?

8       A    Yeah.  That's a broad question, sir, because --

9       Q    Well, I'm looking at the other ones, and it

10   appears that these -- that these notes have been directly

11   e-mailed to you.

12          So was it your understanding that you would

13   receive copies of these safety team meeting notes on a

14   weekly basis?

15      A    It's my understanding that the document required

16   certain parameters to be entered, and those parameters may

17   have fell within what you're looking at on the page.

18      Q    Sir, you didn't answer my question.

19      A    You asked two different questions, though.

20      Q    No, no, sir, my question was:  Was it your

21   understanding that you would be e-mailed these documents on

22   a weekly basis?  That's my question.

23      A    I don't understand the question.

24      Q    Okay.  This IKDAVID.s02837@atstores.us.wal-

25   mart.com, that was your e-mail address for when you were the

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1    asset protection coordinator at Store 2837?

2        A    Yes.

3        Q    Is this still your e-mail address?

4        A    No, sir.

5        Q    Okay.  Do you know if there's any way for Wal-Mart

6    to go back and retrieve any sent e-mails that were directed

7    to this IKDAVID.s02837?

8            MS. MILLER:  Objection.  Form.  Argumentative.

9    BY MR. SMITH:

10       Q    Go ahead, Mr. Davidson.

11       A    I already answered that question.

12       Q    No, you didn't, sir.  Respectfully you didn't.  I

13   asked you:  To your knowledge, is there any way that

14   Wal-Mart can go back and pull, you know, any sent e-mails to

15   that e-mail address because it appears --

16           MS. MILLER:  Objection.  Now this question calls

17   for speculation.

18   BY MR. SMITH:

19       Q    -- because it appears that all of these safety

20   team meeting notes were sent to Store 2837.

21           So I'm really curious as to why for a seven-month

22   period we don't have any safety team meeting notes, and I'm

23   just trying to find out if there's other ways that we can

24   obtain this documentation.

25           MS. MILLER:  We're leaving.  We're leaving.

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

1            MR. SMITH:  I'm almost done.

2            MS. MILLER:  No.  We're leaving.  We're done.

3            Thank you very much, ladies.

4            MR. SMITH:  Let the record reflect that

5    Mr. Davidson and counsel have left --

6            MS. MILLER:  Terminated the deposition.

7            MR. SMITH:  For no reason.

8            MS. MILLER:  No.  I asked you to move off the line

9    of questioning, and you refused to do it.  We will be

10   seeking protection of the court off of this one.

11           MR. SMITH:  On what?  For what?  Protection from

12   what?

13           MS. MILLER:  Because I asked you to move off the

14   line of questioning.  You refused to abuse and harass my

15   witness.  He asked you to move off the line of questioning.

16   He made it very clear on the record that he found it

17   confusing, compound, and abusive.  I asked you to move off

18   the line of questioning multiple times.  You refused to do

19   so.

20           Therefore, we will be seeking the protection of

21   court.  By the way, you did not respond to my communication

22   regarding the deposition that is noticed for Mr. Nash on

23   Friday.

24           MR. SMITH:  I didn't get it.  Miss Miller, I

25   didn't get your letter.  What letter?

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1          MS. MILLER:  I've send you two.

2          MR. QUESTIONER:  Which letter?

3          MS. MILLER:  The one dated last week, the 30th,

4     that you are still containing language regarding the FRCP

5     30 --

6          MR. SMITH:  My understanding, that has been

7     revised and is being sent out.

8          MS. MILLER:  No.  The notice still contains

9     language that is an FRCP 30(b)(6).

10          MR. SMITH:  And that -- if that's not been

11     corrected, that will be corrected.

12          MS. MILLER:  It must be corrected immediately, or

13     we will be seeking protection of the court.

14          MR. SMITH:  I'm deposing him individually.

15     There's absolutely no concern about that.  I'm letting you

16     know we will get that --

17          MS. MILLER:  It needs to be faxed immediately to

18     my office before I get back there today or we will be

19     seeking the protection of the court because I sent another

20     letter today making you aware of that.  But we are leaving

21     because he's not going to put up with these questions.

22          MR. SMITH:  Okay.  Thank you.

23          MS. MILLER:  Thank you.

24          THE VIDEOGRAPHER:  This concludes the deposition

25     of Ian Davidson at --

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1              MS. MILLER:  I do want a copy of the video.  Thank

2     you.

3              THE VIDEOGRAPHER:  -- 4:13 P.M.  Digital Tape

4     No. 2.

5              (The deposition adjourned at 4:13 P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ian Davidson        February 4, 2013
* * * Videotaped Deposition * * *

```
 1                    CERTIFICATE OF DEPONENT

 2    PAGE      LINE       CHANGE

 3    _____

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15             *      *      *      *      *

16          I, IAN DAVIDSON, deponent herein, do hereby
      certify and declare under penalty of perjury the within and
17    foregoing transcription to be my deposition in said action;
      that I have read, corrected and do hereby affix my signature
18    to said deposition.

19

20                              _____
                                IAN DAVIDSON
21                              Deponent

22

23

24

25
```

All-American Court Reporters      (702) 240-4393
www.aacrlv.com

Ian Davidson          February 4, 2013
* * * Videotaped Deposition * * *

1                    CERTIFICATE OF COURT REPORTER

2    STATE OF NEVADA  )
                      ) ss
3    COUNTY OF CLARK  )

4           I, Donna J. Abrahamsen, Certified Court Reporter,

5    State of Nevada, do hereby certify:

6           That I reported the deposition of IAN DAVIDSON,

7    commencing on Monday, February 4, 2013, at 2:05 p.m.

8           That prior to being deposed, the witness was duly

9    sworn by me to testify to the truth.  That I thereafter

10   transcribed my said shorthand notes into typewriting and

11   that the typewritten transcript is a complete, true, and

12   accurate transcription of my said shorthand notes.

13          I further certify that I am not a relative or

14   employee of counsel of any of the parties, nor a relative or

15   employee of the parties involved in said action, nor a

16   person financially interested in the action.

17          In witness whereof, I hereunto subscribe my hand

18   at Las Vegas, Nevada, this 6th day of February, 2013.

19

20   _____
     Donna J. Abrahamsen, RPR, NV. CCR NO. 420
21   CA. CSR NO. 9652, WA. CCR NO. 3262

22

23

24

25

All-American Court Reporters    (702) 240-4393
www.aacrlv.com

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to KLCOWLE.s02837@stores.us.wal-mart.com,
IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 08-06-2010  Week Number: 27

**Did Store Mgr. Attend:** No
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
THE FOLLOWING ASSOCIATES AND MANAGEMENT ATTENDED THE MEETING; SHIFT
MANAGER TONY, ASSISTANT MANAGER CHRIS, ZMS SHRIEKA, APC IAN, SAFETY TEAM
LEADER JEANNIE, MARCUS,STEVEN,TIFFANY,MICHAEL,TOM,JESSIC, RICHARD,
**Unfinished Business:**
TALKED ABOUT SAFETY MEETING WE HAD WITH STORE MANGER SCOTT. TALKED ABOUT UP
COMMING BBQ
**Bi-Weekly RC Topic:** CART RETRIEVAL/FRONT END FOCUS CASHIER MATERIAL HANDLING
&ELECTRIC CART
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 4
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 8.
**New Business:**
PUTTING OUT A MEMO ON SAFETY ASSOCIATE SHOULD BE LOCATED IN THE MIDDLE OF THE
CART STRING FOR STEERING DO NOT PLACE HANDS OR FINGERS BETWEEN THE CARTS
ELECTRIC CART RETRIEVER STAY A FEW FEET AWAY FROM THE BACK END OF PARKED
VEHICLES
**Action Plan For Outstanding Items:**
BY MONDAY STEVEN AND MICHAEL WILL WALK THE STORE AND FILL ALL STATIONS

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU



EXHIBIT
WIT: Davidson
DATE:
All American Court Reporters

WM2012-09505-1134

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to KLCOWLE.s02837@stores.us.wal-mart.com,
IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 08-13-2010  Week Number: 28

**Did Store Mgr. Attend:** No
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
THE FOLLOWING ASSOCIATES AND MANAGEMENT ATTENDED THE MEETING ASSISTANT MANAGER
DEBRA, SAFETY TEAM LEADER JEANNIE, MARCUS, EVIN, BRANDON,BOBBY, JOE KEVIN WILLIAM,
**Unfinished Business:**
TALKING ABOUT THE BBQ ABOUT NEW SAFETY SLOGAN AND BADGES ETC.
**Bi-Weekly RC Topic:** PROPERLIFTINGTECHNIQUES/TEAMWORKTESM LIFT
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 4
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 6
**New Business:**
SEEING HOW WE CAN GET MORE INFORMATION OUT IN THE STORE PERTAINING TO SAFETY AVOID
LIFTING ABOVE THE SHOULDERS COMPLETE WARM-UP/STRETCHING EXERCISES BEFORE LIFTING
AND MOVING OBJECTS
**Action Plan For Outstanding Items:**
TWO AP WILL FILL ALL STATIONS IN THE STORE THEY HAVE TILL 4:00 PM ON MONDAY

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

**Safety Team Meeting Notes Sheet**

**Walmart** :'::
Safety

*Week 2B Safety Team People Lifting Team*

**Attendance:**

Associates who attended the meeting

Team Leader Y/N          Management Sponsor Y/N          Store Manager Y/N

*Ricky, Martin, Marcus, Kevin, Brandon, Bobby, Debbie,
Richard, Dedre, Slim, smily, Joe, walkin*

**Accident Recap:**

Assoc TW____
Assoc YTD _!!_
Cust TW _0_
Cust YTD _4_
Big 3 TY _0_
Big 3 LY _0_

**Unfinished Business:**

Status of last week's action points

**New Business:**

*1 Rev*

Weekly Safety Survey Results/ Accident Corrective Actions/ Safety Playbook

**Plan of Action:**

Objectives, Completion Dates, Person Responsible

*Joe, walkin will fill station 2 min Drills*
*Call @ 325 pieces    2-6 PM Busy time*

**Team Work:**

*D.M need to do pill station*

Keying Notes and Communication

Safety Team Leader Signature _____ Date _11 Dec 2010_
Overnight Associate Signature _____ Date_____
Management Sponsor Signature _____ Date_____

WM2012-09505-1152

Page 1 of 1

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to KLCOWLE.s02837@stores.us.wal-mart.com,
IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: **02837** Market Number: **395** Region Number: **48** Meeting Date: **08-18-2010** Week Number: **29**

**Did Store Mgr. Attend:** Yes
**Did Team Leader Attend:** No
**Did Mgmt. Sponser Attend:** No
**Did Mgmt other than APC/Store Mgr/Sponser attend:** No
**Name of Associates Attending Meeting:**
THE FOLLOWING MANAGEMENT AND ASSOCIATES ATTENDED THE MEETING: STORE MANAGER
SCOTT, SAFETY TEAM LEADER JEANNIE,STEVEN,KEVIN,DIANE,MARINO,RICHARD
**Unfinished Business:**
PREPARING BBQ FOR THE 20 AUG 2010. TALKED ABOUT BEING PROACTIVE ON CUSTOMERS
ACCIDENTS. STORE SCOTT MENTIONED DOING INCENTIVE PROGRAM FOR CUSTOMER ACCIDENT
FREE FOR 30 DAYS
**Bi-Weekly RC Topic:** STRATEGIC MAINTENANCE
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 4
**Customer Accidents This Week:** 1
**Customer Accidents YTD:** 7
**New Business:**
GETTING SAFETY OUT TO ALL THE STORE ASSOCIATES STARTING NEXT WEEK WE WILL BE PICKING
TWO ASSOCIATES FROM DIFFERENT AREAS. SO ALL ASSOCIATES WILL HAVE A CHANCE TO BE
INVOLVE IN SAFETY MEETINGS WE ARE GOING TO START WITH "SEE IT OWN IT"
**Action Plan For Outstanding Items:**
ASSET PROTECTION CHECKED ALL STATIONS

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

WM2012-09505-1156

Safety Team Meeting Notes Sheet


Walmart
Safety

*CUSTOMER STRATEGIC MAINTNC*

**Attendance:**

| | Team Leader Y / N | Management Sponsor Y / N | Store Manager Y / N |
|---|---|---|---|

Associates who attended the meeting

*STEVEN, KEVIN (GATEWAY) DIANE*
*MARINA STEPHANIE RICHARD*
*STORE SCOTT BARCO*

**Accident Recap:**

Assoc TW *0*
Assoc YTD____
Cust TW____
Cust YTD *4*
Big 3 TY____
Big 3 LY____

**Unfinished Business:**

Status of last week's action points

*BBQ STELLO TO EXPRESS*

**New Business:**

Weekly Safety Survey Results/ Accident Corrective Actions/ Safety Playbook

*GOOD HOUSE KEEPING, STRATEGIC MAINTN*
*STORE SCOTT COMESSEE IT YOU OWN IT"*
*OVERLOOK G TO ___N (ASSOC'S)*
*CUSTOMER ACTION DAY - INCENTIVE*
*30 AND 4*

**Plan of Action:**

Objectives, Completion Dates, Person Responsible

*MAKE A BANNER FOR SAFETY*
*"SEE IT YOU OWN IT"*
*GRAB A DIFFERENT PERSON FROM OTHER*
*AREAS*

**Team Work:**

Keying Notes and Communication

Safety Team Leader Signature _____  Date_____

Overnight Associate Signature _____  Date_____

Management Sponsor Signature _____  Date_____

WM2012-09505-1157

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to KLCOWLE.s02837@stores.us.wal-mart.com, IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 08-26-2010  Week Number: 30

**Did Store Mgr. Attend:** No
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
THE FOLLOWING ASSOCIATES AND MANAGEMENT ATTENDED THE MEETING:CO CURTIS, ASSISTANT MANAGER CHRIS, ASSISTANT MANAGER DEBRA, SAFETY TEAM LEADER JEANNIE, SAM, RAFAEL, MISTY, MIKE, KEVIN, SHARON, RICHARD, DIANA, STEVEN, CHRISTINA, DEBRA
**Unfinished Business:**
TALKED ABOUT THE BBQ ALL POSITIVE WENT VERY WELL AND ALSO KEPT IT UNDER BUDGET. WORKING ON SAFETY BOARD TO GET ALL ASSOCIATES INFORMED ON WHAT IS GOING ON IN OUR STORE
**Bi-Weekly RC Topic:** PREVENTION SPILL RESPONSE
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 4
**Customer Accidents This Week:** 1
**Customer Accidents YTD:** 9
**New Business:**
DOING ROLE PLAY IN THE FUTURE. PUT TOGETHER A SAFETY SWEEP AT FIVE IN THE EVENING LAST NIGHT CO CURTIS ASSIGNED KEVIN TO SEE HOW IT WENT FIN OUT NEXT MEETING DAVE FROM DIARY ASK HIM TO FIX THE DOOR IN ELECTRONICS DID WHAT STORE MANAGER SCOTT SAID WENT AND PICK PEOPLE UP TO COME TO THE MEETING WAS REALLY FUN. ZMS JEFF ALLREADY READY ORDER NEW MATS FOR PRODUCE
**Action Plan For Outstanding Items:**

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

*Prevention Spill Response & Ownership, Safety*

**Safety Team Meeting Notes Sheet**    **Walmart** Safety

*Week 30*
*8 50 06 2010   Salette meeting meet*

| Attendance: | | | |
|---|---|---|---|
| Associates who attended the meeting | Team Leader Y/N | Management Sponsor Y/N | Store Manager Y/(N) |
| | Sara, Rafel, mister, mike, kevin, Shawn, Chris, Richard, Deshawn, Tom, Jeannie, Steven, Christine, Curtis, Dee, | | |

**Accident Recap:**

Assoc TW _O_

Assoc YTD ___

Cust TW _O_

Cust YTD ___

Big 3 TY ___

Big 3 LY ___

**Unfinished Business:** *working on Safety Board*

**Status of last week's action points** *spill response*

**New Business:**

**Weekly Safety Survey Results/ Accident Corrective Actions/ Safety Playbook** *190 days Free*

**Plan of Action:** *Steve Savery*

**Objectives, Completion Dates, Person Responsible** *8/31/2010   Role Play   11:00 A.m — / Safety Store Coordinators, Spill Stations, over night 5 A.m sweep Dave Hough, to fix electronic swing door for view of live-bait*

**Team Work:** *Bring New faces to safety meeting*

**Keying Notes and Communication** *Front end Rose folding get zms Jeff to order newons*

Safety Team Leader Signature _____  Date_____

Overnight Associate Signature _____  Date_____

Management Sponsor Signature _____  Date_____

WM2012-09505-1166

**Safety Team Meeting Notes Sheet**

Walmart Safety

01 SEP 2010

TOPIC : SAFE LIFTING - ASSOCIATE MATERIAL HAND

| Attendance: | Team Leader Y / N | Management Sponsor Y / N | Store Manager Y / N |
|---|---|---|---|
| Associates who attended the meeting | _(handwritten names)_ | | |

**Accident Recap:**

Assoc TW _0_
Assoc YTD _7_
Cust TW _0_
Cust YTD _197_
Big 3 TY _18_
Big 3 LY _37_

**Unfinished Business:** _197 - 4 -_

**Status of last week's action points** _(handwritten)_

**New Business:** _(handwritten)_

**Weekly Safety Survey Results/ Accident Corrective Actions/ Safety Playbook** _(handwritten)_

**Plan of Action:** _(handwritten)_

**Objectives, Completion Dates, Person Responsible** _(handwritten)_

**Team Work:**

**Keying Notes and Communication**

Safety Team Leader Signature _(signature)_    Date _(handwritten)_
Overnight Associate Signature _____    Date _____
Management Sponsor Signature _____    Date _____

WM2012-09505-1173

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to klcowle.s02837@stores.us.wal-mart.com, ikdavid.s02837@stores.us.wal-mart.com, sabkive@wal-mart.com

Store Number: **02837** Market Number: 395 Region Number: **48** Meeting Date: **09-08-2010** Week Number: **32**

**Did Store Mgr. Attend:** No
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
THE FOLLOWING ASSOCIATES AND MANAGEMENT ATTENDED THE SAFETY MEETING TODAY: CO MIA, ASSISTANT MANAGER DEBRA , APC IAN, SAFETY TEAM LEADER JEANNIE, MISTY,DIANA, ZS RICHARD, MICHAEL
**Unfinished Business:**
SAFETY TEAM SWEEP- WORKING WITH ZS RICHARD IN THE FRONT WILL HAVE A PLAN TOGETHER BY 09 SEP 2010. SAFETY THEM EWE WILL EXTEND IT LONGER. CHANGING BBQ TO EITHER 24 SEP OR 01 OCT WILL GET WITH STORE MANAGER SCOTT
**Bi-Weekly RC Topic:** BACKROOM/RECEIVING STANDARDSOVERNIGHT ASSICIATE MATERIAL HANDLING SAFE STOCKING
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 4
**Customer Accidents This Week:** 1
**Customer Accidents YTD:** 12
**New Business:**
TALKED ABOUT SAFETY THEM TALKED ABOUT BBQ. EVERY STORE MEETING TALK ABOUT SAFETY THE THEME, ACCIDENTS AND DO MORE SKITS
**Action Plan For Outstanding Items:**
WILL HAVE MICHAEL CHECK ALL STATIONS IN THE STORE ON 09 SEP 2010

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

## Safety Weekly Team Meeting Notes
### Review and Print

A copy of these notes have been emailed to KLCOWLE.s02837@stores.us.wal-mart.com, IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 09-16-2010  Week Number: 33

**Did Store Mgr. Attend:** No
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
THE FOLLOWING ASSOCIATES AND MANAGEMENT ATTENDED THE SAFETY MEETING; SHIFT MANAGER TONY, ASSISTANT MANAGER CHRIS, APC IAN, SAFETY TEAM LEADER JEANNIE, ZMS NICOLE, KEVIN JEREME, DESIREE.
**Unfinished Business:**
TALKEDED ABOUT BBQ ON THIS COMING THURSDAY TALKED ABOUT SAFETY SWEEP THE EVENING ASSISTANT MANAGER CHRIS SAID HE WOULD DO IT ON THE DAYS HE WORKS THREE WEEKS AND ONE DAY UNTIL STORE MANAGER SCOTT WILL WEAR KILT AND PLAY FOR US IF WE CAN GO THIRTY CUSTOMER ACCIDENT FREE
**Bi-Weekly RC Topic:** CASHIER MATERIAL HANDELING
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 5
**Customer Accidents This Week:** 1
**Customer Accidents YTD:** 8
**New Business:**
TALKED ABOUT SAFETY THEME CONTEST TALKED ABOUT ZMS ABRAHAM CERTIFY NEW ASSOCIATES FOR FORKLIFT AND WALKIE STACKER.
**Action Plan For Outstanding Items:**
STEVEN FROM TLE WILL CHECK ALL STATIONS FOR KIT PADS ETC DIANE FROM ELECTRONICE WILL CHECK ALL EYE WASH STATIONS

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

WM2012-09505-1184

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to KLCOWLE.s02837@stores.us.wal-mart.com, IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: **02837**  Market Number: **395**  Region Number: **48**  Meeting Date: **09-23-2010**  Week Number: **34**

**Did Store Mgr. Attend:** No
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
THE FOLLOWING ASSOCIATES AND MANAGEMENT ATTENDED THE
SAFETY MEETING AND SAFETY CLASS. CO TONY, ASSISTANT
MANAGER CHRIS, APC IAN, SAFETY TEAM LEADER JEANNIE, STEVEN,
SCOTT, Q, MICHAEL, BRANDON,
**Unfinished Business:**
STILL TALKING SAFETY THEME TRYING TO FIGURE OUT TO GET A
SAFETY SWEEP GOING IN THE AFTERNOON
**Bi-Weekly RC Topic:** SHOPPING CART SAFETY/CART RETRIEVAL
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 1
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 8
**New Business:**
TALKED ABOUT WHAT TO DO FOR NEXT THIRTY DAYS???
**Action Plan For Outstanding Items:**
BRANDON SAID HE WOULD CHECK ALL STATIONS DEAD LINE FOR
THIS IS TUESDAY

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

WM2012-09505-1192



# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to KLCOWLE.s02837@stores.us.wal-mart.com, IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 09-29-2010  Week Number: 35

**Did Store Mgr. Attend:** Yes
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
THE FOLLOWING ASSOCIATES AND MANAGEMENT ATTENDED THE SAFETY TEAM MEETING: SHIFT MANAGER CURTIS, DIANNA,CHRISTINA, APC IAN, SAFETY TEAM LEADER JEANNIE,AND ZMS RICHARD,
**Unfinished Business:**
BBQ NOTES 1. NOT ENOUGHT FOOD THERE WAS BUT ASSOCIATES CAME BACK FOR THIRDS, FOURTHS, ETC 2. PROVIDE SOME VEGETARIAN FOOD FOR THOSE WHO DONT EAT MEAT
**Bi-Weekly RC Topic:** DISPALY SAFETY/STORE COMMUNICATION
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 1
**Customer Accidents This Week:** 1
**Customer Accidents YTD:** 8
**New Business:**
TO PASS OUT REWARDS FOR ASSOCIATES THAT SPOT SPILLS AND GET IT UP. RECIEVED SUGGESTION FOR THE NEXT BBQ WHICH IS IN 16 DAYS
**Action Plan For Outstanding Items:**
CHECK OUT HBA SAFETY STATION ALONG WITH COSMETICS



THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

WM2012-09505-1199

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to KLCOWLE.s02837@stores.us.wal-mart.com,
IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: **02837** Market Number: **395** Region Number: **48** Meeting Date: **10-08-2010** Week
Number: **36**

**Did Store Mgr. Attend:** No
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** No
**Name of Associates Attending Meeting:**
THE FOLLOWING ASSOCIATES AND MANAGEMENT CAME TO THE MEETING, ZMS
ABRAM, SAFETY TEAM LEADER JEANNIE, APC IAN, TONYA, MICHAEL, SCOTT, MARCUS
**Unfinished Business:**
BBQ: WE ARE TALKING ABOUT HOT LINKS WITH THE FIXINS OR FAJITAS. SAFETY
ZONE IS STILL NOT WORKING ARE GOING TO REGROUP TRY ANOTHER OPTION.
**Bi-Weekly RC Topic:** SPILL STATION SUPPLIES/DEVELOPING A PLAN STOCKED SPILL
STATION
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 2
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 10
**New Business:**
TALKED ABOUT : SPILL STATION MOUNTING RACK DUST PAN WE TALKED ABOUT
ORDERING MORE BROOMS AND DUST PANS, POCKECT PADS SAFETY THEME IS
COMING UP, IN THREE MORE WEEKS CONTEST WILL BE OVER. CUSTOMER ACCIDENTS
-NEED TO FIGURE OUT A GAME PLAN ON HOW TO OVERCOME THESE ACCIDENTS..
**Action Plan For Outstanding Items:**
MICHAEL ON SATURDAY WILL WALK AND CHECK ALL SPILL STATIONS IN THE STORE.
WORKING ON PUTTING UP FLYERS UP, TO GET THOSE ASSOCIATES INVOLVED IN
SAFETY AT NIGHT GOING TO TALK TO APC IAN ON GETTING A NIGHT SAFETY TEAM
LEADER.

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to sjnash.s02837@stores.us.wal-mart.com, ikdavid.s02837@stores.us.wal-mart.com, sablive@wal-mart.com
Store Number: **02837** Market Number: **395** Region Number: **48** Meeting Date: **10-19-2010** Week Number: **38**

**Did Store Mgr. Attend:** No
**Did Team Leader Attend:** No
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
KURTIS GLORIA MACK IAN CHRISTINA TONIA MICHELLE SHARON
**Unfinished Business:**
30 DAYS CUSTOMER ACCIDENT FREE- SM SCOTT WILL WEAR A KILT AND PLAY THE BAGPIPES IN THE FRONT OF THE STORE- STORE IS CURRENTLY AT 8 DAYS. STORE NOW DOES SAFETY SWEEPS EACH HR AS DIRECTED BY SM SCOTT. STORE HAS BEEN VERY CONSISTENT IN CONDUCTING THE SAFETY SWEEPS, AND BOTH ASSOCIATES AND MANAGEMENT HAVE BEEN ENGAGED.
**Bi-Weekly RC Topic:** PLE /LOTO
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 7
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 73
**New Business:**
ALL PLE MUST BE INSPECTED PRIOR TO IT'S USE. ALL USERS MUST HAVE A CURRENT LICENSE AND IT MUST BE VISIBLE WHEN IT IS IN USE. ASSOCIATES CAN SEE ZMS ABRAM TO BE CERTIFIED. SAFETY TEAM LEADER JEANNIE IS LONGER WITH WALMART AND D5 WENDY WILL BE THE NEW SAFETY TEAM LEADER. SHE WILL BE TRAINED ON SAFETY THIS WEEK AND NEXT WEEK AND TAKE OVER. MUST MAKE SURE THAT WE FOLLOW THE 10 FT RULE WHEN USING PLE AND MAKE SURE IT IS USED PROPERLY. MUST WEAR A VEST. PLE CANNOT BE PARKED IN FRONT OF EMERGENCTY EXITS.
**Action Plan For Outstanding Items:**
WENDY TO BE NEW SAFETY TEAM LEADER. MAINTENANCE CLOSET MUST BE CLEANED OUT DUE TO ELECTRICAL STORAGE EQUIPMENT.

WM2012-09505-1218

# Safety Weekly Team Meeting Notes
## Review and Print



A copy of these notes have been emailed to Sjnash.s02837@stores.us.wal-mart.com, lkdavid.s02837@stores.us.wal-mart.com, Sablive@wal-mart.com
**Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 11-05-2010  Week Number: 40**

**Did Store Mgr. Attend: No**
**Did Team Leader Attend: Yes**
**Did Mgmt. Sponser Attend: Yes**
**Did Mgmt other than APC/Store Mgr/Sponser attend: Yes**
**Name of Associates Attending Meeting:**
Sherika,Chris,Tabitha,Noel,Yesinia,Cora,Sam,Jeniffer,Mike,Niki
**Unfinished Business:**
None
**Bi-Weekly RC Topic:** Ladder Safety
**Associate Accidents This Week: 0**
**Associate Accidents YTD: 0**
**Customer Accidents This Week: 0**
**Customer Accidents YTD: 0**
**New Business:**
Gearing up for the Event, preparing first aid kits, pocket pads on hand, stable stacking of merchandise, securing furniture displays, maintenance associates on hand for spot mops, calling out safety sweeps every hour on the hour, making sure ladders are put up properly, empty pallets are removed from the salesfloor, associates are working from rocket carts in a safe and clean mannner. No exceptions on the Monthly Safety Survey.
**Action Plan For Outstanding Items:**
None.

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

WM2012-09505-1206

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to SJNASH.s02837@stores.us.wal-mart.com, IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 11-11-2010  Week Number: 41

**Did Store Mgr. Attend:** No
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
Tyrone,Shawn,Steven,Ian,Tabitha,Anna,Sherika
**Unfinished Business:**
none
**Bi-Weekly RC Topic:** Cashier Material Handling
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 0
**Customer Accidents This Week:** 1talked
**Customer Accidents YTD:** 0
**New Business:**
Talked about having cashiers watching the segment take care of your back ,we also want to start back doing the pre-workout stretches in the morning and afternoon meetings .Also finding a safe spot for apparel to put company approved step stools
**Action Plan For Outstanding Items:**
Steven will walk off fire extiguishers ,Dian will walk off eyewash station,shawn will check spill stations on a daily bases

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to SJNASH.s02837@stores.us.wal-mart.com, IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 11-26-2010  Week Number: 43

**Did Store Mgr. Attend:** Yes
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** No
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
STORE MGR SCOTT,SHARON, SHARIA ,SHERIKA ,ABRAM
**Unfinished Business:**
N/A
**Bi-Weekly RC Topic:** EMERGENCY EXIT &CODE RED PROCEDURES
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 0
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 0
**New Business:**
WE TALKED ABOUT PORTERS IN THE RIGHT PLACES ,NO PALLETS/STACKED ON FLOOR PUT THE PDQ'S ON THE FLOOR THAT WAY IT WILL BE EASIER TO JUST BREAK DOWN THE BOXES RATHER THAN TRYNA BRING A PALLET JACK ON THE SALES FLOOR TO PICK UP PALLETS ,EMERGENCY RESPONSE TEAM IN PLACE , KEEP VESTIBULES CLEAR OF TRASH
**Action Plan For Outstanding Items:**
N/A

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

WM2012-09505-1234

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to sjnash.s02837@stores.us.wal-mart.com,
ikdavid.s02837@stores.us.wal-mart.com, sablive@wal-mart.com
Store Number: **02837** Market Number: **395** Region Number: **48** Meeting Date: **12-03–2010** Week Number: **44**

**Did Store Mgr. Attend: Yes**
**Did Team Leader Attend: Yes**
**Did Mgmt. Sponser Attend: Yes**
**Did Mgmt other than APC/Store Mgr/Sponser attend: Yes**
**Name of Associates Attending Meeting:**
STORE MGR SCOTT,SHIFT MGR'S MIA & TONY,AP IAN ,AP'S
WAYKEAM,JONELL,TOM,CORDELL,STEVEN, APG ANNA, SPORTING GOODS
JOE, CASHIER NANCY, PET JEFF, DOMESTICS TOMASA, CLAIMS
MISTY ,MAINTNANCE ADAN,ASM CHRIS, APPAREL KRISTAN,FROZEN
PC,DAIRY SHAWN
**Unfinished Business:**
N/A
**Bi-Weekly RC Topic:** SALES FLOOR FOCUS
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 0
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 0
**New Business:**
MAKE SURE THAT ALL CASHIER'S WATCH THE VIDEO ON TAKING CARE OF
THERE BACKS ,MAKING SURE THAT STRETCHES ARE BEING INPUT IN THE
MORNING MEETING TO MAKE THESE A YES ON THE MONTHLY SURVEY
THIS MONTH .WE TALKED ABOUT MAKING SURE L CARTS
LADDERS ,ROCKET CARTS ARE NEVER LEFT UNATTENDED , CODUCT
BUMP TEST ,REMOVE DUBRIS IN A TIMELY MANNER FROM THE SALES
FLOOR
**Action Plan For Outstanding Items:**
SHAWN FROM DAIRY WILL CHECK EXTENSION CORDS MONTHLY DUE
DATE THE END OF EVERY MONTH :DEC- 30-10

12/3/2010
WM2012-09505-1236

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to sjnash.s02837@stores.us.wal-mart.com, ikdavid.s02837@stores.us.wal-mart.com, sablive@wal-mart.com
Store Number: **02837**  Market Number: **395**  Region Number: **48**  Meeting Date: **12-16-2010**  Week Number: **46**

**Did Store Mgr. Attend:** Yes
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
SHARON PHARMACY , MIKE HARDWARE,NICKI HOMELINES, MIKE TLE, MIYORI HOME LINES ,JOE SPORTING GOODS, ZMS RICHARD ,ROBERT GARDEN, SHAWN DAIRY, MGR TRAINE JASMINE , ZS SHERIKA , ASM CHRIS &LARRY ,HENRY CART PUSHER
**Unfinished Business:**
N/A
**Bi-Weekly RC Topic:** FRONT END FOCUS
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 0
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 0
**New Business:**
WE TALKED ABOUT BEING SAFE IN THE PARKINGLOT IF YOU GET OFF WHEN ITS DARK MAKE SURE NOT TO WALK OUT ALONE , WE ALSO TALKED ABOUT HOW TO APPROACH A CUSTOMER WHEN A CHILD IS NOT SITTING IN A CART PROPERLY , THE TOPIC WE TALKED ABOUT TODAY WAS FRONTEND FOCUS WHEN THERES A HEAVY ITEM MAKE SURE THE CASHIERS ARE USING HAND SCANNERS AND PULL TAGS TO AVOID UNNECESSARY LIFING ALLOW THE CONVEYOR BELT TO MOVE THE MERCHANDISE TOWARDS SCANNER TO AVOID OVERREACHING .
**Action Plan For Outstanding Items:**
LYNE FILL SPILL STATIONS ON A EVERYDAY STEVEN CHECALL FIRE EXTINGUSHERS AROND THE STORE AND MAKE SURE THERE SIGNED OFF :DEC 20

THESE TABLES ARE FOR WAL-MART ASSOCIATES ONLY! THANK-YOU

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to sjnash.s02837@stores.us.wal-mart.com, ikdavid.s02837@stores.us.wal-mart.com, sablive@wal-mart.com
Store Number: **02837** Market Number: **395** Region Number: **48** Meeting Date: **12-24-2010** Week Number: **47**

**Did Store Mgr. Attend:** Yes
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
STORE MGR SCOTT,AST MGR DEB , APC IAN,UNLOADER
ERIC,YOLI HBA, ARIANA COSMETICS, CASHIER PHILLIP, JOE
SPORTING GOOD,UNLOADER JOSH
**Unfinished Business:**

**Bi-Weekly RC Topic:** SPILL STATION FOCUS
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 0
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 0
**New Business:**
WE TALKED ABOUT KEEPING SPILL STATIONS CLEAR OF
CLUTTER THE ONLY ITEMS THAT SHOULD BE IN SPILLSTATIONS
ARE ITEMS SPILL ABSORBENT, BROOM DUST PAN, SAFETY
CONES , ABSORBENT PADS WE ALSO TALKED ABOUT ORDERING
MORE BROOMS AND DUSTPANS FOR EACH SPILL STATION
**Action Plan For Outstanding Items:**
LYNEE , CHECK SPILL STATIONS DAILY

WM2012-09505-1241

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to sjnash.s02837@stores.us.wal-mart.com, ikdavid.s02837@stores.us.wal-mart.com, sablive@wal-mart.com
Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 12-29-2010  Week Number: 48

**Did Store Mgr. Attend:** Yes
**Did Team Leader Attend:** Yes
**Did Mgmt. Sponser Attend:** Yes
**Did Mgmt other than APC/Store Mgr/Sponser attend:** Yes
**Name of Associates Attending Meeting:**
STORE MGR SCOTT, ASM CHRIS , ZS SHERIKA , SAM GARDENCENTER, NICKI HOMELINES, MIKE HARD WARE, GEDDY PORTER, ZMS NICOLE , EUNICE FABRICS
**Unfinished Business:**
N/A
**Bi-Weekly RC Topic:** CLERANCE AISLES
**Associate Accidents This Week:** 0
**Associate Accidents YTD:** 0
**Customer Accidents This Week:** 0
**Customer Accidents YTD:** 0
**New Business:**
WE TALKED ABOUT WHEN DOING MODS OR ANY PROJECT DAY OR OVERNIGHTS WORK CLEAN ,WE ALSO DISCUSSED THE REASONS FOR NOT USING SHOPING CARTS FOR PROJECTS , RIGHT NOW WE HAVE ALOT OF AREAS THAT ARE CLERANCED IN THE STORE MAKE SURE LARGE ITEMS ARE STABLE ON SIDE COUNTER ,WE TALKED ABOUT MAKING SURE WHEN WE HEAR SAFETY SWEEPS OVER HEAD TO STOP DOING WHAT YOUR DOING AND WALK THE AREAS AROUND YOU
**Action Plan For Outstanding Items:**
SHAWN IN DAIRY NEEDS TO CHECK ALL EXTENSION CORDS DUE: DEC 31 2010

WM2012-09505-1243

# Safety Weekly Team Meeting Notes
## Review and Print

A copy of these notes have been emailed to SJNASH.s02837@stores.us.wal-mart.com, IKDAVID.s02837@stores.us.wal-mart.com, SABLIVE@wal-mart.com
Store Number: 02837  Market Number: 395  Region Number: 48  Meeting Date: 01-07-2011  Week Number: 49

**Did Store Mgr. Attend: Yes**
**Did Team Leader Attend: Yes**
**Did Mgmt. Sponser Attend: No**
**Did Mgmt other than APC/Store Mgr/Sponser attend: No**
**Name of Associates Attending Meeting:**
STORE MGR SCOTT,ZS SHERIKA, KEVIN GARDEN CENTER , ROBERT GARDEN CENTER, KENT HARD WARE, MARINO DRY GROCERY, ANTONIO CANDY & 82 , DONNA ELECTRONIC , NICOLE TOYS ,
**Unfinished Business:**
N/A
**Bi-Weekly RC Topic: SAFETY TEAM REENERGIZED**
**Associate Accidents This Week: 0**
**Associate Accidents YTD: 0**
**Customer Accidents This Week: 0**
**Customer Accidents YTD: 0**
**New Business:**
WE ARE 1 DAY AWAY FROM BEING 330 DAYS ACCIDENT FREE WE TALKED ABOUT SEVERAL IDEAS FOR OUR 30 DAYS ACCIDENT FREE EVENT , AND WHAT WE CAN DO TO CONTINUE TO DRIVE ASSOCIATES TO WANT TO STAY ACCIDENT FREE WE ALSO TALKED ABOUT HAVING POCKET PADS ON US AT ALL TIMES ,ALSO IF YOU SEE IT YOU OWN IT NEVER WALK AWAY FROM A SPILL
**Action Plan For Outstanding Items:**
N/A

WM2012-09505-1246

Ian Davidson       February 4, 2013
* * * Videotaped Deposition * * *

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEVADA

 3

 4   KAYLEEN SHAKESPEAR,        )   CASE NO.:
                                )   2:12-cv-01064-MMD-PAL
 5           Plaintiff,         )
                                )
 6   vs.                        )
                                )
 7   WAL-MART STORES, INC. LLC, a )      CERTIFIED
     Foreign Corporation d/b/a  )
 8   WAL-MART SOTRE #2837; and DOE )         COPY
     EMPLOYEE; DOE SUPERVISOR;  )
 9   DOES I through X; and ROE  )
     CORPORATIONS I through X,  )
10   inclusive,                 )
                                )
11           Defendants.        )
     _____)

12

13          VIDEOTAPED DEPOSITION OF IAN DAVIDSON

14         Taken on Monday, February 4, 2013

15                 At 2:05 P.M.

16         At 4435 South Eastern Avenue

17              Las Vegas, Nevada

18

19

20

21

22

23

24   Reported by:  DONNA J. ABRAHAMSEN, RPR, NV. CCR NO. 420
                   CA. CSR NO. 9652, WA. CCR NO. 3262
25
```

All-American Court Reporters   (702) 240-4393
www.aacrlv.com